JjKLEES, Chief Judge.
On July 24, 1997, appellant Jessie Lee and co-defendant Ila Womack Grey were charged by bill of information with the second-degree murder of Peter Weber.[1] On August 26, 1997, after a hearing, the trial court found the appellant was competent to proceed to trial. On October 16, 1997, the court granted a motion to sever the charges for trial. Appellant Lee was tried by a jury on July 28, 1997, and found guilty as charged. On December 8, 1997, he was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.[2] This appeal followed.

STATEMENT OF THE FACTS

In February of 1997, Helen Spence filed a missing person report as to her brother, Peter Weber. The case was assigned to Detective Kevin Anderson, who first contacted Weber’s employer and found that Weber had not picked up his last paycheck. Anderson then went to Weber’s last known address, 1636 North Lopez Street, to look for Weber’s roommates, Ila Grey and defendant, Jessie Lee. At the | ¡.residence, Det. Anderson spoke to a man who identified himself as Keith Larenis. *1178 The man advised Det. Anderson that neither Grey nor Lee was at home, and that he was babysitting Grey’s son for her. Det. Anderson subsequently learned that Larenis was, in fact, defendant Jessie Lee.
Det. Anderson next went to see Ila Grey at her place of employment, the Witch’s Closet, an occult supply shop in the French Quarter. Grey gave Det. Anderson leads relative to Weber, but none of them produced positive results.
Ms. Spence testified that she obtained a list from the bank indicating that someone had used her brother’s ATM card after his disappearance around Christmas of 1996. She further testified that in April of 1997 she placed a call to the Witch’s Closet hoping to speak to Ila Grey. Ms. Grey was not there, but someone there gave her the phone number of the North Lopez Street residence. When she called there, a gentleman answered the phone. She asked if it was Jessie Lee, and he acknowledged that it was. She asked him if he knew her brother from New Jersey. Lee said that he met her brother there once; then he hurriedly ended the conversation.
The victim’s brother, Robert Weber, testified that he flew into New Orleans from France in March of 1997 to assist in the search. Robert Weber testified that he spoke with the defendant at the North Lopez Street residence. The defendant told him that he did not know what happened to his brother. The defendant further told him that he and Ila kicked the victim out because he was doing drugs. The defendant suggested that the victim might be in a rehabilitation facility. Robert Weber had previously spoken with his brother’s employer and learned that his ^brother had worked a double shift the first week in January, which made him doubt the defendant’s story about excessive drug use.
The defendant further gave Robert Weber the name of various bars which he alleged were frequented by the victim. Several were gay bars. Robert Weber showed his brother’s picture around the various bars, to no avail, although he did not believe that his brother was gay. The defendant further told Robert Weber that the victim had gotten into a fight at a bar and, later that night, had gotten into a fight with Ila.
On a second visit to the North Lopez Street residence, Robert Weber asked the defendant for his brother’s belongings. The defendant gave him five audiocas-settes and a green jacket. Knowing that his brother liked to sketch, he asked the defendant about his brother’s sketchbook. The defendant replied that he had torn it up because it had nude drawings in it and some of them looked like the defendant.
An investigator for the Whitney Bank testified that on January 6, 1997, someone withdrew twenty dollars from the victim’s account with an ATM card. The following day, within a few minutes, someone withdrew four hundred and sixty dollars with the ATM card, in seven separate transactions.
Det. Anderson had communicated regularly with Ms. Spence to update her on the status of the investigation. At one point, he suggested that she obtain Weber’s dental records for him. She did so.
On April 21, 1997, a partially decomposed body was found in a wooded area in St. Bernard Parish. Using the dental records, it was positively identified as the body of Peter Weber.
|4Pr. Paul McGarry testified that his autopsy was performed the morning after the body was discovered. The body was found wrapped in a sheet and outer-wrapped in green carpet. There was a shirt tied around the victim’s neck and a plastic bag over the head. The bruising and broken bones in the neck area indicated that the victim died of strangulation. Due to the decomposition of the body, it could not be determined if the defendant had also been stabbed with a knife. Also due to the decomposition, chemical analysis relative to alcohol or drug use could not be determined. However, because no fingernails were bent or broken, the coroner *1179 opined that the victim was not engaged in a straggle.
The North Lopez Street residence was then searched pursuant to a search warrant. Under the house the officers observed what appeared to be a shallow grave. Various items were retrieved from inside and underneath the house and subsequently were linked to the body-of the victim. Analysis of soil samples indicated that the soil found in the soles of the victim’s shoes was the same as that found underneath the house. A piece of green carpet taken from the house matched the carpet in which the body was wrapped. The officers also found pieces of cord and two knives under the house. Inside the house, the officers observed a red substance on the wall and a stain on the floor.
Elizabeth Quakely worked with lia Grey at the Witch’s Closet from December 1996 until late April 1997. She testified that she met the defendant in January and moved in with the defendant and Grey in February of 1997. She further testified that she never met Peter Weber, though she recalled seeing some things that might have belonged to him. She recalled that the defendant and Grey gave some clothes to Mack Powell. She heard the defendant tell Powell that the owner of the clothes would not be coming back for them.
IsQuakely lived with the defendant and Grey until they were evicted from the Lopez Street house. Then she moved with them to the home of Jack Elder, the owner of the Witch’s Closet. She only stayed at the Elders’ residence for about a week. After that, Quakely told Grey that she and the defendant had become romantically involved. At that point, she and the defendant were both asked to leave.
Quakely testified that, when she moved into the Lopez Street residence, she was told not to go under the house because it was not safe. She complied.
Quakely further testified that either the defendant or Grey told her that Weber was kicked out of the house because he was smoking crack, and they were concerned that he would do drugs around Grey’s son. Quakely further testified that she and Grey and the defendant all did drugs at the house. However, she testified that they did not do drugs when Grey’s son was in the room.
Mack Powell testified that the defendant gave him some clothing and other items when he went to the Lopez Street house to visit Quakely, his former girlfriend. At that time, the defendant told him that the owner would not be coming back for them. Powell discarded the things he did not like. The ones that he kept, he brought to court. They consisted of black clothing and some cassette tapes. Powell further testified that Quakely and the defendant stayed with him for a short time after they were asked to leave the Elders’ house.
Jack Elder, owner of the Witch’s Closet, testified that he saw the defendant get drunk one night in a bar and get pretty hostile. Elder managed to get him home, but the defendant did not want to go to sleep. That night the defendant told Elder that he had had a lot of vagrants stay with him, but now he was cleaning house. He wanted a nice, quiet home for himself, Grey and her son. He further [ fitold Elder that he had “gotten rid of’ someone named Red Dragon and also some guy named Peter. He told Elder that he got rid of Peter because Grey and the boy did not like him.
Sgt. Gina Holland testified that she was put in charge of the case for St. Bernard Parish when the body was discovered there. After the body was identified, she went with Det. Anderson to the Witch’s Closet, where they picked up Grey for questioning. Grey made two statements which were inconsistent with each other.
After some investigation, the defendant was located in Fort Walton Beach, Florida. St. Bernard Sheriff Jack Stephens and Det. Marcel David picked up the defendant in Florida after he waived an extradition hearing. Det. David testified that he and Sheriff Stephens picked up the defendant at the jail in Florida, identified themselves, explained the charges against him, and advised him of his constitutional rights. *1180 The defendant made no statement at that time, but shortly after he was secured in the rear of the vehicle for the drive back to Louisiana, he began talking to them. He said he was glad it was all over because he was having trouble sleeping at night.
The defendant admitted that he killed Peter Weber. He said that there was a fight and that Weber started the fight. The defendant further told Det. David that when, in the course of the fight, Weber pushed Grey, the defendant became enraged and blacked out. The defendant stated that he blacks out when he becomes extremely angry. He further stated that, when he realized what was going on, Peter Weber was dead, and there was blood everywhere. The defendant said that he tried to control the blood with the plastic bag. He further stated that he and Grey buried Weber’s body under the house on North Lopez Street. It remained |7there until they found out they were being evicted; then they moved it to a random location in St. Bernard Parish.
The defendant, the sheriff, and Det. David also talked about witchcraft and other things on their drive back to Louisiana. The defendant stated that he and his girlfriend were good witches and did not practice evil. Witchcraft was their religion.
The defendant stated that he did not call 911 because he had problems pending and did not want to contact the police.
When Sheriff Stephens, Det. David and the defendant arrived in St. Bernard Parish, Det. David introduced the defendant to Sgt. Holland. The defendant requested that he be permitted to talk with his attorney in Florida. After the defendant made a long-distance phone call, he stated that he would speak with Sgt. Holland, but that he would not sign anything or make any kind of written statement. He further said that his attorney told him to speak tp the police and tell them the truth.
Sgt. Holland testified that she advised the defendant of his Miranda rights when he was first presented to her and that the defendant signed a rights of arrestee form. He then admitted that he killed Peter Weber, buried him under the house, then moved the body to St. Bernard Parish with the help of Ila Grey. Sgt. Holland testified that the defendant made no mention of self-defense or a fight in his statement to her.

ERRORS PATENT REVIEW

A review of the record for errors patent indicates that there were none.
1 ¡ASSIGNMENT ONE
The appellant first argues that the district court erred by denying the motion for mistrial relative to the State’s indirect reference to other crimes evidence. La. C.Cr.P. art. 770, in pertinent part, provides:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
A police officer is not a court official under Art. 770. State v. Jones, 94-0926 (La.App. 4th Cir. 12/28/94), 648 So.2d 472, writ denied, 95-0272 (La.6/16/95), 655 So.2d 346. Absent a showing of unresponsive answers by the officer or improper intent by the prosecutor, a mistrial is not warranted. State v. Lee, 618 So.2d 551 (La.App. 4th Cir.1993), writ denied, 624 So.2d 1222 (La.1993).
In the instant case, the appellant avers that the motion for mistrial was *1181 based on two instances of reference to other crimes evidence. In the first instance, the appellant suggests that the State solicited a reference to other crimes from Sgt. Holland in the following exchange:
Q. (By prosecutor, Mr. Gillie): And after speaking with Miss Grey on those two occasions, what did you do after that?
|9A. Well, I obtained an arrest warrant for Jessie Lee.
The appellant fails to note a previous exchange in which Sgt. Holland discusses her reason for requesting an interview with Ms. Grey. Sgt. Holland there responded, “I asked her if she would accompany me to my office and let me interview her concerning the whereabouts of Peter Weber.”
Considering the prior exchange, a jury would likely have concluded that the officer already intended to arrest the appellant, and perhaps obtained information from Ms. Grey as to where he might be found. In any event, Sgt. Holland’s response that she proceeded to apply for an arrest warrant after taking statements from Ms. Grey is not a reference to other crimes.
The second instance of alleged reference to other crimes occurred when Mr. Gillie was questioning Det. David relative to the oral statements made by the defendant during the trip from Ft. Walton to New Orleans, as follows:
Q. He (the appellant) told you Mr. Weber was the aggressor?
A. Yes, he told me Mr. Weber was the aggressor. Of course, I had some questions for him at that point. I asked him like when he told me he blacked out, when he came through there was blood everywhere. I asked him why didn’t he just call 911 to try and get some help. And he told me he couldn’t because of some problems he had pending. He didn’t want any contact with the police.
The officer never discussed the “problems,” which.appellant alleged were pending. Nor was there any evidence put forward by any other witness to suggest that there were any other charges pending against the appellant when he was picked up for the instant offense. Rather, the jury reasonably concluded that the appellant did not call 911 because he would have a problem with the instant offense.
11flMoreover, the prosecutor’s question referred only to the appellant’s claim that Weber was the aggressor. Despite the contentions of counsel in the supplemental brief, there was no pattern of unresponsive answers in Det. David’s testimony. Rather, his answers provided a narrative which was the gist of the appellant’s oral statement.
This assignment is without merit.

ASSIGNMENT TWO

The appellant argues that it was error to admit the two knives found under the residence into evidence. To be admissible, demonstrative evidence must be identified and authenticated. La. C.E. art. 901. “As a foundation for admitting demonstrative evidence, it must be established that the object sought to be introduced is more probably than not connected with the case.” State v. Richardson, 96-2598, p.4 (La.App. 4th Cir. 12/17/97), 703 So.2d 1371, 1373, writ denied, 98-0228 (La.9/25/98), 726 So.2d 7; State v. Mat thews, 95-1245 (La.App. 4th Cir.8/21/96), 679 So.2d 977, 984, writ denied, 96-2332 (La.1/31/97), 687 So.2d 403; State v. Tatum, 506 So.2d 584 (La.App. 4th Cir.1987). “A lack of positive identification of demonstrative evidence or its chain of custody goes to the weight of the evidence, not to its admissibility, and the connection of that evidence to the case is a factual matter to be determined by the trier of fact.” State v. Lewis, 452 So.2d 720 (La.App. 4th Cir.1984), vacated in part as to sentence only, 457 So.2d 1187 (La.1984).
The appellant argues that the State failed to lay a proper foundation to admit the two knives into evidence. The appel *1182 lant notes that the coroner opined that the victim’s death was by strangulation and that the tissue was too badly decomposed Into determine if there were any stab wounds. The State responds that the coroner could not rule out stab wounds. In addition, the State suggests that the knives could have been used to threaten the victim or to cut cords. In either event, considering that the knives were found under the residence where the appellant admitted burying the body, it is reasonable to assume that they were connected with the case.
In addition, the jury heard the coroner’s testimony relative to the cause of death and the inability to determine if there were stab wounds. The jury was thus not led to believe any fact connected with the knives which was not supported by the evidence. Also, in oral statements, the defendant admitted the killing and attempted to justify it. The admission of the knives into evidence thus could not have affected the verdict.
A reviewing court may declare an error harmless beyond a reasonable doubt if it finds the verdict actually rendered in the trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. Vale, 96-2953, p.2 (La.9/19/97), 699 So.2d 876, 877; State v.Code, 627 So.2d 1373, 1384-85 (La.1993), cert. den., Code v. Louisiana, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); reh. denied, 512 U.S. 1248, 114 S.Ct. 2775, 129 L.Ed.2d 887 (1994). Considering the facts of this case, if it was error to admit the knives into evidence, the error was harmless.

CONCLUSION

Accordingly, for the reasons assigned herein, the conviction and sentence of defendant Jessie Lee are hereby affirmed.

AFFIRMED.

. Co-defendant Ila Womack Grey is also referred to in court documents and at trial as Ila Womack and Ila Grey.

. Co-defendant Grey was tried on March 31, 1998. She was also found guilty of second-degree murder. Following several continuances relative to a motion for new trial, she was sentenced on October 15, 1998 to life imprisonment without benefits. Her appeal is lodged in this court at 99-KA-0416.