764 So.2d 108 (2000)
STATE of Louisiana
v.
Ila WOMACK-GREY.
No. 99-KA-0416.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 2000.
*110 Michael G. Riehlmann, Whittaker & Riehlmann, New Orleans, Louisiana, Counsel for Defendant-Appellant.
Harry F. Connick, District Attorney of Orleans Parish, Susan Erlanger Talbot, Assistant District Attorney, New Orleans, Louisiana, Counsel for State Appellee.
Court composed of Judge JOAN BERNARD ARMSTRONG, Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES.
PLOTKIN, Judge.
This criminal appeal presents us with several issues, two of which are particularly critical. The first of these is whether the testimony of Thayne Womaek, seven years of age at trial and six years of age at the time of the relevant eventsand the son of defendant-appellant Ha Womack-Greywas competent and credible so as to support sufficiently, in combination with the other evidence presented, defendant's conviction for second degree murder. The second is whether the trial court erred in denying defendant's motions for a mistrial, which were made subsequent to the State's elicitation of testimony inculpating defendant in the use of illegal drugs and to the State's recapitulation of that testimony during closing arguments.

PROCEDURAL HISTORY:
On July 24, 1997, defendant-appellant Ila Wornack-Grey and co-defendant Jesse Lee were charged by grand jury indictment *111 with the second-degree murder of Peter Weber. On August 22, 1997, the trial court heard and denied a motion to suppress statements made by defendant. On October 16, 1997, the trial court granted a motion to sever the defendants. On March 30-31, 1998, defendant was tried by a twelve-person jury, which found her guilty as charged. Following the denial of her motion for new trial on October 15, 1998, defendant was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence.[1]

STATEMENT OF FACTS:
On February 21, 1997, Detective Kevin Anderson began to investigate a missing person report filed on February 7th by Helen Spence after the disappearance of her brother, Peter Weber. Det. Anderson went to Weber's last known address, 1636 North Lopez Street, to look for Weber's roommates, defendant Ila Womack-Grey and Jesse Lee. At the residence, Det. Anderson spoke to a man who identified himself as Keith Larenis. The man advised Det. Anderson that neither Grey nor Lee were present and that he was babysitting Grey's son. Det. Anderson subsequently learned that the man who identified himself as Larenis was, in fact, Jesse Lee.
Det. Anderson then went to see defendant at her place of employment, The Witch's Closet, a shop in the French Quarter. She told Det. Anderson that she evicted Weber at the end of January because he had been using drugs. She then gave Det. Anderson the name of a manager at Pat O'Brien's bar who might know of Weber's whereabouts. However, no one at Pat O'Brien's had ever heard of the "manager" named by defendant. Det. Anderson also made a futile search for Weber in local drug rehabilitation facilities; and he contacted Weber's employer, who had not seen Weber for some time and who said that Weber had not collected his last paycheck.
Helen Spence testified that, prior to filing the missing person report, she telephoned her brother's employer and the defendant, who told Ms. Spence that she evicted Weber after a fight at a bar. Defendant further stated that she had last seen Weber walking towards a nearby Circle K convenience store. Defendant said that she would have called a cab for him but that she did not have a telephone then. Defendant further told Ms. Spence that Weber was a nice guy and that she hoped that no harm had come to him. She also gave Ms. Spence the names of places allegedly frequented by Weber, which Ms. Spence attempted to investigate.
In March of 1997, the victim's brother, Robert Weber, flew to New Orleans to assist in the search. He first met Jesse Lee at the North Lopez Street residence; he then met with defendant at a coffee shop near The Witch's Closet. Defendant and Lee told Robert Weber that they had asked Peter to leave after he got into a fight at a bar and then tried to fight with defendant. They suggested that Peter might be in a rehabilitation center for alcohol or drugs.
Defendant also gave Robert Weber a list of "gay bars" that Peter allegedly frequented and a list of drug dealers who might know something. Robert Weber had learned from Peter's employer that Peter was working double shifts, so he did not believe that Peter was abusing drugs. He also knew that Peter had a girlfriend in New Jersey and had always dated girls, so he did not believe that Peter was gay. Nevertheless, he investigated the bars, the drug dealers and the rehabilitation centers suggested by defendant.
*112 On Robert Weber's second visit to the North Lopez Street residence, the defendant, her son, Thayne Womack, and Jesse Lee were all present. Robert Weber asked for his brother's belongings, and defendant gave him five audiocassettes and a jacket. She told Robert Weber that Peter had taken his clothing to a thrift store.
A family service worker, Kelly Bentley, testified that she attempted to contact defendant several times beginning in January of 1997. On some occasions, she left her card in the door or with a young man. When defendant finally responded to a letter and came for an interview, Ms. Bentley asked her about the young man at the house. Defendant told her that he was a friend, "Peter." Defendant further informed Ms. Bentley that Peter had the lights turned on and a phone installed, as these were items of concern to the case worker.
On April 21, 1997, a partially decomposed body was found in a wooded area in St. Bernard Parish. From dental records furnished by Ms. Spence, it was positively identified as the body of Peter Weber.
Dr. Paul McGarry performed an autopsy the morning after the body was discovered. The body had been wrapped in a sheet, which in turn was wrapped in some green carpeting. There was a shirt tied around the victim's neck and a plastic bag over the head. The bruising and broken bones in the neck area indicated that the victim died from strangulation. Due to the decomposition of the body, Dr. McGarry could not determine whether the victim had also incurred superficial knife wounds; however, he stated that there were no deep stab wounds. The decomposition also prevented chemical tests for alcohol or drug use.
Police officers then obtained a warrant and searched the North Lopez Street residence. Under the house, the officers observed what appeared to be a shallow grave. Various items were retrieved from inside and underneath the house and later linked to the victim's body. Analysis of soil samples indicated that the soil found in the soles of the victim's shoes was the same as that found underneath the house. A piece of green carpet taken from the house matched the carpet in which the body was wrapped. The officers also found pieces of cord and two knives under the house. Inside the house, the officers observed a red substance on the wall and a stain on the floor.
Sergeant Gina Holland testified that she was placed in charge of the case for St. Bernard Parish when the body was discovered there. On May 2, 1997, after the body had been identified, she went with Det. Anderson to The Witch's Closet, where they retrieved defendant for questioning. After being transported to the St. Bernard detectives' office, defendant was advised of her Miranda rights and made a statement.
In this statement, which was read to the jury, defendant told the officers that, in January, she, Jesse Lee and Peter Weber were at a bar and that she and Jesse dragged Peter home to keep him out of a fight. Peter was still belligerent when they arrived at the North Lopez Street residence. Jesse said that he would handle the situation and that defendant and Thayne should leave. In a long and detailed account, defendant described hiding in the bathroom with Thayne while Peter and Jesse fought; asking Peter about some small zip-lock bags she had seen while Peter was packing his belongings; asking Peter whether he wanted her to call a cab; and various other events. Eventually defendant and Thayne left the house and did not return until dawn. She noticed various things were disturbed and unusual in the house. She described dark stains, flies, and an unusual smell in the living room which she thought was coming from the rabbit's cage; but she did not discuss the matter with Jesse. When she and Jesse were later evicted, Jesse and a friend named Matthew moved something *113 heavy from underneath the house. Defendant thought she saw a person's feet in the object and knew that the object was Peter Weber's body.
After making this statement, defendant was arrested for second-degree murder and taken into custody. The next day, May 3rd, defendant asked if she could make another statement to correct her first one. In her second statement, which was also read to the jury, defendant said that she lied in her May 2nd statement. She now explained that she had seen Jesse hit Peter in the head with a stool, cover his head with a plastic bag and strangle him. She also saw Jesse bury the body under the house, and Jesse made her help move the body after they were evicted. Defendant stated that she drove a truck bearing the body to St. Bernard Parish, while Jesse directed her to a place to deposit it.
Adele Bridges testified that she took over the child protection case when Kelly Bentley went out on family leave. When Ms. Bridges learned that defendant had been arrested, she contacted the authorities to find out who was caring for Thayne. She learned that Thayne was staying with Jack Elder, the manager of The Witch's Closet, and his live-in girlfriend, Michelle Reyes. Ms. Bridges interviewed Thayne, primarily asking whether he wanted to live with his father, Patrick Womack, in Salt Lake City. Ms. Bridges also arranged for Thayne to be evaluated by Dr. Valerie Turgeon to see whether therapy was warranted in light of the child's potentially distressing past.
Thayne was accompanied to Dr. Turgeon's office by Jack Elder, but Dr. Turgeon interviewed Thayne alone. Thayne told Dr. Turgeon that Jesse killed his friend and that that was why his mother was in jail. Thayne stated that he did not witness the murder but learned about it from Jack Elder. Thayne further stated that he believed Jesse might have killed Peter, but that his mother would not have. When asked about these statements, Dr. Turgeon opined that it is not unusual for a child to deny that a parent has done something wrong. Thayne was reluctant to talk about his father and said that he could not recall what his father looked like.
Ms. Bridges, meanwhile, called Patrick Womack in Salt Lake City to notify him of defendant's arrest; and Mr. Womack requested immediate custody of his son. Mr. Womack and his girlfriend, Donna, did not question Thayne about the murder because they did not want to upset him. After several weeks, they hopefully assumed that Thayne had not seen anything of the killing because he never talked about it. Then one day, after Mr. Womack and Donna bought Thayne a little blue chair, Thayne began telling them about how his chair at home was broken in the fight among Jesse, Peter and his mother. After Thayne gave Mr. Womack and Donna a detailed account of the fight, Mr. Womack contacted authorities in New Orleans. While Mr. Womack was on the telephone with the district attorney's office, Thayne, with Donna's assistance, made a diagram depicting where in the house various events relating to the fight occurred. Mr. Womack then arranged to come to New Orleans with Thayne.
Thayne was seven years old when he testified at his mother's trial; he was six at the time of the murder. Thayne testified that, during the fight, Jesse and his mother were beating on his "babysitter." Thayne testified that he was first in the middle of the living room but that his mother led him to the corner. Thayne saw his mother come from the kitchen with a knife, then heard a man say "No, Ila." Then it was quiet. Thayne demonstrated how the "babysitter" was positioned on the floor and testified that Jesse and his mother were on their knees over him. Thayne identified the black-handled knife found under the house as the knife his mother had during the fight. Thayne admitted that he might have previously told a lie about what he had seen. He also admitted telling a lie about seeing his father kill animals. He testified that his mother *114 made him tell the lie about his father. Thayne confirmed that the babysitter's name was Peter.
It was stipulated that Frank Haab, an employee of the Whitney Bank, would testify that, on January 6, 1997, someone withdrew twenty dollars from an ATM using Peter Weber's access card. The following day, the 7th, there were two additional twenty-dollar withdrawals, one at 4:24 p.m. and another at 6:45 p.m. Then, beginning at 9:41 p.m. that day, there were eight unsuccessful attempts to take money from the same account at the same location, the Circle K, which is two blocks away from the North Lopez Street residence. Mr. Haab would further testify that a balance of $584.84 remained in Weber's account at the Whitney.
Elizabeth Quigley[2] worked at The Witch's Closet from December of 1996 until April of 1997. She testified that she moved in with defendant and Jesse Lee in February of 1997; her testimony does not indicate that she ever met Peter Weber. She testified that defendant stated that she had evicted Weber because he was using drugs around Thayne, and testified further that all of themincluding defendantused drugs at the house, though not while Thayne was in the room.
Quigley lived with the defendant and Lee until they were evicted. She then moved with them to Jack Elder's home, but she only stayed there for about a week. After that, Quigley and Lee told defendant that they had become romantically involved. At that point, defendant asked them both to leave; and they moved in with Quigley's former boyfriend, Mack Powell, for about a week, then went to Florida for a vacation. Lee was extradited from a Florida jail on the murder charge. Quigley recalled that Lee admitted to her that he committed the murder, but she testified that she was on drugs at the time and could not remember exactly what he said about it.
Mack Powell testified that Jesse Lee gave him some clothing and other items when he went to the North Lopez Street house to visit Quigley. Powell brought the items to court for Lee's trial, then gave them to Weber's family afterwards. He provided a list of the items at the instant trial.
Powell confirmed that Quigley and Lee stayed with him for a short time after they left the Elders' house. Powell testified that, while helping Quigley and Lee pack their things, he found a letter inside an envelope with Jesse's name on it. After testimony by a handwriting expert and defendant's estranged husband on the issue, the defense stipulated that defendant wrote the letter. Powell gave the letter to the police. In the letter, which was shown to the jury, defendant wrote:
Jesse,
My love, I swore your life before my own to you and the Gods though I knew that it would end this way. I still believe in you as I swore I would. With you goes the last of the goodness in my heart. I had so longed that you would be my redemption but you were my damnation.
I shall love you all the days of my life but I have done nothing to warrant this, so I swear before all on my soul that I shall NOT betray you to the police and I ask the same of you even though I realize now you never meant any of it.
Love always,
The defense called Det. Marcel David to testify regarding statements made by Jesse Lee. Det. David and St. Bernard Sheriff Jack Stephens retrieved Lee from Florida. Det. David testified that he and Sheriff Stephens identified themselves to Lee, explained the charges, and advised *115 Lee of his constitutional rights. Lee made no statement at that time; but shortly after he was secured in the rear of the vehicle for the drive back to Louisiana, he began talking to them. He said he was glad it was all over because he was having trouble sleeping at night.
Lee admitted to the officers that he killed Peter Weber. He said that there was a fight, which Weber had started. Lee further told Det. David that when, in the course of the fight, Weber struck defendant, Lee came to her defense. However, he became so enraged that he blacked out. When he came to his senses, Weber was dead and blood was everywhere. Lee tried to control the blood with the plastic bag. He and defendant later buried Weber's body under the house, where it remained until they learned they were being evicted, at which time they moved it to a random location in St. Bernard Parish. Lee stated that he did not call 911 because he had problems pending and did not want to contact the police.
Jack Elder moved to California prior to defendant's trial, and both sides stipulated to his unavailability. At the request of the defense, Elder's testimony from Lee's trial was read to the jury. Elder testified that he saw Lee get drunk one night in a bar and become quite hostile. Elder managed to bring him home, but Lee did not want to go to sleep. That night Lee told Elder that he had had a lot of vagrants stay with him but that now he was cleaning his house. He wanted a quiet home for himself, defendant and Thayne. He further told Elder that he had "gotten rid of" someone named Red Dragon and also someone named Peter, whom defendant and Thayne did not like.

ERRORS PATENT:
A review of the record for errors patent reveals none.

FIRST ASSIGNMENT OF ERROR:
Defendant first argues that her second statement, made on May 3, 1997, should have been suppressed as the fruit of an illegal detention.
When supported by the evidence, a trial judge's ruling on a motion to suppress a confession is entitled to deference. State v. Carter, 94-2859, p. 24 (La.11/27/95), 664 So.2d 367, 385. A reviewing court may consider the evidence presented at trial in addition to the evidence presented at the hearing on the motion to suppress. State v. Green, 94-0887, p. 11 (La.5/22/95), 655 So.2d 272, 280.
In support of her claim, defendant cites State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179. There the defendant was stopped, handcuffed and questioned in a patrol car by an officer who knew him from the neighborhood. The officer was alone when he heard Fisher's statement. The officer based his stop on general rumors in the neighborhood and could not say whether any of his unnamed sources either witnessed the defendant shoot the victim or heard the defendant admit to shooting the victim. This court found that the officer had at least the reasonable suspicion required for an investigatory stop. This court further stated that, when the driver of the car in which Fisher had been a passenger drove off, the reasonable suspicion ripened into probable cause. Finally, this court deferred to the officer's discretion as to the need for handcuffs and thereafter affirmed the conviction. State v. Fisher, 96-0004 (La.App. 4 Cir. 4/2/97), 692 So.2d 713.
In reversing Fisher's conviction, the Louisiana Supreme Court, stated:
The outset inquiry on the admissibility issue is whether defendant had been arrested when he allegedly made the statements. If so, the next inquiry is whether the arrest was based on probable cause.... If there was no probable cause to support the arrest, the third inquiry is whether the alleged statements were inadmissible as the fruit of the unlawful arrest.
97-1133 at p.4, 720 So.2d at 1182.
As to the third inquiry, the Supreme Court held: *116 Statements given during a period of illegal detention are inadmissible, even though voluntarily given, if they are the product of illegal detention and not the result of an independent act of free will. Florida v. Royer, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).
The fact that the accused would not have made a statement "but for" the illegal arrest does not alone establish a causal link sufficient to require exclusion of the statement. Brown, 422 U.S. at 602-03, 95 S.Ct. 2254, 45 L.Ed.2d 416. On the other hand, the fact that an accused may have been properly informed of his constitutional rights and waived them, while relevant, does not alone break the causal link. [Taylor v. Alabama, 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982)]; Brown, 422 U.S. at 601, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (holding Miranda warnings are not a "talisman"). Other factors in assessing the link between the illegal arrest and the statements are the existence of intervening circumstances, the "temporal proximity" of the arrest and the statements, and the "purpose and flagrancy of the official misconduct." Brown, 422 U.S. at 604, 95 S.Ct. 2254, 45 L.Ed.2d 416. See also Taylor, 457 U.S. at 690-91, 102 S.Ct. 2664, 73 L.Ed.2d 314; Dunaway v. New York, 442 U.S. 200, 218-19, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
97-1133 at p. 11, 720 So.2d at 1185-1186.
In the instant case, it is undisputed that defendant was under arrest when she made the second statement on May 3rd. Thus, we must make the second inquiry and determine whether the arrest of defendant following her first statement on May 2nd was supported by probable cause.
Probable cause to arrest exists when the facts and circumstances, either personally known to the arresting officer or of which he has reasonable and trustworthy information, are sufficient to justify a man of ordinary caution in believing that the person to be arrested has committed a crime. State v. Thomas, 349 So.2d 270, 272 (La.1977). The standard for assessing probable cause is an objective standard that must withstand the "detached, neutral scrutiny of a judge." State v. Flowers, 441 So.2d 707, 712 (La.1983), rev'd on other grounds, 779 F.2d 1115 (5 Cir.1986). The determination of probable cause must take into account the "practical considerations of everyday life on which ... average police officers can be expected to act." State v. Raheem, 464 So.2d 293, 296 (La. 1985).
According to the motion and trial testimony, Det. Anderson and Sgt. Holland worked together after the victim's body was recovered. Det. Anderson interviewed defendant prior to the discovery of the body, at which time defendant not only failed to report the murder, but also sent the detective on a futile search for the "missing" person. When defendant made the May 2nd statement, the officers had already discovered the body and classified the death as a homicide. Defendant was brought in for questioning because she was one of the last people who saw the victim alive. In the May 2nd statement, she admitted hearing a violent argument between Lee and the victim prior to the latter's disappearance. That statement, when combined with the misinformation and false leads defendant gave Det. Anderson at the initial interview, suggested to the police that defendant knew of the crime and, more importantly, that she had not wanted it to be discovered.
It is certainly questionable whether the police had probable cause at this point to believe that defendant had actually participated in the homicide. That is, defendant's failure to report the crime may have created a suspicion that she participated in it, but an equally proper inference would have been that she was protecting the fact of the crime and/or the perpetrator from discovery. The State accordingly argues that, even if the officers lacked probable *117 cause to believe that defendant was guilty of second-degree murder, they had probable cause to believe that she was an accessory after the fact under La. R.S. 14:25, which provides:
An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction or punishment.
In her brief, defendant cites State v. Jackson, 344 So.2d 961 (La.1977), in which our supreme court stated that a person cannot be charged as an accessory after the fact simply because he or she fails to report a crime.[3]Jackson, however, may be readily distinguished from the instant case. Here, defendant not only failed to report the homicide, but, when she was first interviewed by the police, she also misled them into believing that the victim was still alive and that his whereabouts could be discovered by contacting an apparently fictitious manager at Pat O'Brien's and/or the local drug rehabilitation centers. Recalling defendant's misinformation, the police were justified in believing that, at a minimum, defendant intended to help the true murderer avoid discovery and arrest.
Even if we assume, out of an abundance of caution, that the officers did not have probable cause to arrest defendant after her first statement, we must still make the third inquiry discussed in Fisher, i.e. whether the statement given during a period of illegal detention was inadmissible, even though voluntarily given, because it was the product of illegal detention and not of an independent act of free will. As noted above, a court must first consider whether the defendant was advised of and waived her constitutional rights. In addition, a court must also consider the existence of intervening circumstances; the "temporal proximity" of the arrest and the statements; and the "purpose and flagrancy of the official misconduct." Fisher, 97-1133 at p. 11, 720 So.2d at 1186. The contested statement indicates that defendant was advised of and waived her constitutional rights. Moreover, the statement was made on the day after the arrest, not immediately after arrest; and it was made at defendant's request.
By contrast, the statement in Fisher was oral, and the alleged waiver of rights was undocumented. The contested statements were made in a patrol car immediately after arrest and subsequently upon arrival at the police station. Finally, the officer taking the statement testified that he sought out the defendant based on rumors in the neighborhood but that he failed to notify homicide detectives or to investigate the facts himself for the five months that passed since he learned of the rumors inculpating the defendant.
Considering defendant's request that she be permitted to correct her prior statement; the time elapsed between the arrest and the statement; and the officers' apparent good faith in investigating the homicide, defendant's statement appears to have been an independent act of free will. For this reason, and because the police had probable cause to arrest her as, at the minimum, an accessory after the fact, we hold that the May 3rd statement was properly admitted.
This assignment of error is without merit.

SECOND ASSIGNMENT OF ERROR:
Defendant next argues that the evidence presented by the State was insufficient to support her conviction of seconddegree murder beyond a reasonable doubt. Specifically, she argues that the only evidence *118 inculpating her in the actual murder, as opposed to the mere aiding of Jesse Lee in its concealment, was the trial testimony of her son, Thayne, which was inconsistent with his prior statements and otherwise incredible.
In State v. Ash, 97-2061, pp. 4-5 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 667-68, writ denied, 99-0721 (La.7/2/99), 747 So.2d 15, this court summarized the standard of review that applies when a defendant claims that the evidence produced to convict her was constitutionally insufficient:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole and not just the evidence most favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305 (La.1988). Additionally, the reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. Id. The trier of fact's determination of credibility is not to be disturbed on appeal absent an abuse of discretion. State v. Cashen, 544 So.2d 1268 (La.App. 4 Cir.1989). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proved such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Initially, we note that defendant's various deceptions and outright lies clearly establish her complicity in concealing the murder. She misled both the victim's siblings and investigators. For example, in her first statement to Sgt. Holland, defendant denied knowing about the murder and said she had watched the victim pack his things and had asked if she should call a cab for him. Later in the same statement, defendant said that she realized that the object that Jesse and a friend were removing from underneath her residence was the victim's body. In her second statement, defendant admitted to cutting the clothesline that was tied around the body before it was buried and subsequently to helping Lee dispose of the body in St. Bernard Parish after they were evicted.
However, defendant correctly notes that there is no evidence tending to establish her direct participation in the actual murder except for the testimony of her seven-year-old son.[4] Thayne testified that he saw defendant and Lee kneeling over the victim and beating him, although he saw only "half" of the fight. He saw his mother take a knife from the kitchen and into the living room during the struggle. He identified the black-handled knife found under the house as the one his mother took into the living room.[5] He *119 testified that he then heard a male voice say "No, Ila," after which there was a silence. During his testimony, Thayne helped diagram the location of these events in the house. Thayne's testimony tended to show that defendant participated in the actual murder and not merely in its concealment.[6] If credible, the testimony of a single witness may establish the elements of a crime beyond a reasonable doubt. See State v. Allen, 94-1895, p. 7 (La.App. 4 Cir. 9/15/95), 661 So.2d 1078, 1084, writs denied, 95-2557 and 95-2475 (La.2/2/96), 666 So.2d 1087.
We are aware of and sensitive to the problem of assessing a child's ability to tell the truth in court. In Louisiana, the court traditionally examines the child witness and determines whether he or she can distinguish the truth from a lie and whether he or she understands the importance of telling the truth. We note that new methodologies are available to assess a child's competence to testify, such as the Lyon-Saywitz picture test.[7] In this case, Thayne was questioned about his understanding of the importance of telling the truth in the "truth [witness] chair." He admitted that he might have previously told lies about his father and about what he saw on the night of the murder. A trial court's ruling on a witness's competence, including his ability to understand the difference between truth and falsity, should not be disturbed absent an abuse of discretion. See State v. Cedrington, 98-253 (La. App. 5 Cir. 12/16/98), 725 So.2d 565, writ denied, 99-0190 (La.6/4/99), 743 So.2d 1249. We find no abuse of discretion in the trial court's examination of Thayne and its decision to allow him to testify.
The jury heard Thayne's testimony implicating his mother in the actual murder of the victim; it also heard the testimony of Ms. Bridges and Dr. Turgeon, which included prior inconsistent statements made by Thayne, such as Thayne's statements that he did not see the actual murder. As recounted in our statement of the facts, the parties were able to introduce and explore Thayne's prior inconsistent statements; the potential influence of his father and Jack Elder; and his desire to protect his mother. These topics were further developed during closing arguments. The jury then chose to believe Thayne's trial testimony and, by implication, to disbelieve his statements made to Ms. Bridges and Dr. Turgeon. The jury further chose to believe that Thayne had not been influenced and/or pressured into testifying as he did at trial; and viewing the totality of the evidence in the light most favorable to the State, it accordingly could have found defendant guilty beyond a reasonable doubt.
In her brief, defendant cites State v. Mussall, supra, in which our supreme court reversed a conviction based on eye-witness testimony so filled with "numerous eccentricities, unusual coincidences and lack of corroboration" that no rational trier of fact could have found guilt beyond a reasonable doubt. However, as defendant notes, a situation like that in Mussall is very rare. In all but the most extreme cases, this court, having only a cold record before it, must give great deference to the jury's ability to resolve credibility conflicts. We do not believe that the contradictions in Thayne's testimony render this such an extreme case.
*120 This assignment of error is without merit.

THIRD ASSIGNMENT OF ERROR:
Defendant next argues that the trial court erred in denying her motions for a mistrial following the State's introduction of other crimes evidence and its reiteration of that evidence during closing arguments. Specifically, defendant complains that the State elicited testimony that defendant and others used illegal drugs in her home while her son was also present in the home, albeit in a separate room.

The Testimony of Elizabeth Quigley
During the presentation of its case, the State called Ms. Quigley, who had worked with defendant at The Witch's Closet and who was invited to move into an "extra room" in defendant's residence in February of 1997. Quigley moved in around Valentine's Day and lived in the residence until she, Lee, defendant and Thayne were evicted in April. At some point, defendant told Quigley that there had been a man living in the house before but that defendant had evicted him for using drugs in front of Thayne. The following then transpired:
[THE STATE] And [defendant] said that was a problem because he did drugs around Thayne?
A. Yeah.
Q. So drugs were forbidden in the house?
[DEFENSE COUNSEL]:
Judge, I'm going to object. First of all, he's leading his witness. And secondly, I object to the relevancy of that. If you would like, I will approach the bench and explain.
THE COURT:
I'll let her testify to anything she that she may be aware of while she was present.
[DEFENSE COUNSEL]:
Note my exception.
[BY THE STATE]:
Q. Were you aware whether or not drugs were done in the house?
[DEFENSE COUNSEL]:
Objection.
THE COURT:
While you were present did you observedid you ever observe anything like that? That's really the question.
THE WITNESS:
Yes, I did.
[BY THE STATE]:
While you were present did you know who would be doing drugs in the house?
A. Yeah. Should I say?
Q. Sure.
A. Myself, Ila, Jessie, and a friend of Ila's who I only know as Skip.
[DEFENSE COUNSEL]:
Judge, I'm going to object and move for a mistrial.[8]
THE COURT:
I'll deny that.
[DEFENSE COUNSEL]:
Note my exception.
[BY THE STATE]:
Q. Would Thayne be in the house during this time?
A. He was in the house. He was in his bedroom.
*121 The State argues that this testimony was elicited not to show that defendant was a bad person and mother because she used illegal drugs while Thayne was in the house, but rather to impeach defendants statements that she had evicted the victim because he used illegal drugs in Thaynes presence. The State contends, in other words, that the elicitation of this testimony was a proper means of undermining defendants credibility. We disagree.
Under the Louisiana Code of Evidence, evidence that is not relevant is inadmissible; and while relevance is a prerequisite for admissibility, it is not a guarantee of it. See La. C.E. art. 402. "`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La. C.E. art. 401. A significant provision for barring minimally relevant evidence is La. C.E. art. 403, which provides, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."
The evidence presented, particularly the evidence relating to the failed uses of the victim's ATM card, established that the murder occurred on January 7, 1997. However, Quigley did not move into the house until mid-Februaryseveral weeks later. Her testimony that defendant stated that she had evicted Weber for his use of drugs in Thayne's presence was relevant and admissible for the purpose of proving defendant's knowledge of the crime. That is, defendant's statement was simply another lie that established defendant's role in concealing the murder.[9]
Quigley's testimony that defendant herself used illegal drugs in the house after the murder, however, is something entirely different. The question here becomes this: did evidence that defendant used illegal drugs after the murder have a tendency to make defendant's participation in its actual commission more or less probable than it would have been without such evidence? It did notunless one assumes that, because defendant was using drugs after the murder, she may have been using them before it and therefore was someone prone to disregard the law and, perhaps, to commit acts of violence. However, this is the kind of prejudicial, "bad person" evidence that the Code of Evidence bars except in specific instances. That is, La. C.E. art. 404(B)(1) provides in pertinent part:
... evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that [she] acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident....
Again, defendant's use of illegal drugs after the murder had only the most tenuous of relationships to the issue of her actual participation in the murder. Accordingly, Quigley's testimony regarding defendant's drug use was inadmissible under art. 404(B). As a technical matter, it was also inadmissible under art. 403; for whatever relevance it hadif anywas substantially outweighed by the danger of unfair prejudice to defendant, who was then revealed to the jury as a drug user and, accordingly, a criminal and an unfit mother.[10]
*122 Nevertheless, under Johnson, supra, the admission of Quigley's testimony is subject to a harmless error analysis. That is, we must decide "whether the guilty verdict actually rendered is surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
As is apparent from our analysis of defendant's first two assignments of error, it is indisputable that defendant concealed the victim's death by assisting Jesse Lee in hiding the corpse, first under the house, then in St. Bernard Parish, and by repeatedly lying as to the victim's whereabouts. However, but for the testimony of defendant's seven-year-old son, Thayne, the evidence presented would not have been constitutionally sufficient to convict defendant of second degree murder; and Thayne's trial testimony directly contradicted his previous statements to Ms. Bridges and Dr. Turgeon, two professionals who had been satisfied that Thayne had not seen something as traumatic as a homicide committed by his mother. In other words, the evidence of defendant's guilt was far from overwhelming.
That said, we conclude that there is a reasonable probability that the evidence of defendant's use of illegal drugs, which presented her as a criminal and an unfit mother, prejudiced the jurors against her and tainted their resolution of the conflict between Thayne's present and past statements. Or perhaps the evidence persuaded the jurors that defendant's concealment of the murder was so pervasive as to "establish" her guilt, assuming an inference that some drug-users are prone to commit violent crimes. Be that as it may, because we cannot state with the utmost confidence that the jury would have rendered a guilty verdict even without hearing this evidence, we cannot classify its admission as a "harmless error."
In other words, the verdict rendered was not surely unattributable to the wrongful introduction of the testimony. We therefore hold that the admission of Ms. Quigley's reference to defendant's drug use unduly compromised defendant's right to a fair trial.

The States Rebuttal Argument
During the States rebuttal argument, as the prosecutor was commenting on defendants credibility, the following occurred:
[MR. GILLIE, ASSISTANT DISTRICT ATTORNEY]:
You know, she continually told the Spences and Mr. Weber all kinds of lies: smoking crack, kicked him out. Told the roommate, Beth Quigley, had to get rid of him. Smoking crack around my son. Were there drugs in that house, Miss Quigley?
Yes.
Was Thayne around?
Yes.
[DEFENSE COUNSEL]:
Judge, I'm going to object and move for a mistrial again. Id like to note that for the record.
THE COURT:
Ill deny the motion for a mistrial. Ill ask you to stay off of that, Mr. Gillie.
La.C.Cr.P. art. 770 provides in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
* * *
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

*123 * * *
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
(Emphases added.)
Here, as discussed above, Ms. Quigleys testimony about defendants drug use was bad person evidence that was marginally relevant, if relevant at all; and it was accordingly barred by La. C.E. arts. 403 and 404(B) and possibly by art. 402. Therefore, the prosecutors comments on her drug use were mandatory grounds for a mistrial under La.C.Cr.P. art. 770(2). A different result would not follow even if the trial court had admonished the jury, as opposed to the prosecutor.
In sum, defendants third assignment of error has merit.

CONCLUSION:
Because defendant was prejudiced by the elicitation and introduction of testimony implicating her in crimes unrelated to the one charged and because the States comments on such crimes in its rebuttal argument warranted a mistrial we reverse her conviction and sentence and remand for retrial. Discussion of defendants fourth and fifth assignments of error is consequently pretermitted.
REVERSED AND REMANDED.
ARMSTRONG, J., Dissents.
ARMSTRONG, J., dissenting.
I respectfully dissent. Considering the persuasive eyewitness testimony of the defendant's son and the defendant's numerous misrepresentations about the case, this evidence that the defendant and others used illegal drugs in the house surely did not affect the verdict.
Accordingly, I would affirm the defendant's conviction and sentence.
NOTES
[1] Jesse Lee was tried first, on November 24, 1997, and found guilty as charged. He was sentenced on December 8, 1997, to life imprisonment without benefits; and this court affirmed his conviction. State v. Lee, 98-0512 (La.App.4 Cir.11/17/99), 747 So.2d 1176. In that appeal, Lee's first name was spelled "Jessie." However, documents in this record indicate that Lee's first name is Jesse.
[2] In Jesse Lee's case, Quigley is referred to as "Quakely." In the instant case, Quigley did not testify as to when she began working at The Witch's Closet or when she met defendant. However, at Lee's trial, Quigley testified that she began working there, with defendant, in December of 1996.
[3] In State v. Chism, 436 So.2d 464, 467 (La. 1983), the supreme court disavowed Jackson to the extent that it indicates, in dicta, that proof of specific intent is necessary to convict someone as an accessory after the fact. That is, under Chism, only proof of general intent is required.
[4] Defendant's handwritten letter to Lee is vague and tends to establish her knowledge and concealment of the murder more strongly than it does her commission of it.
[5] As previously stated, no knife wounds were discovered during the autopsy.
[6] Defendant argues that, even if it had been credible, Thayne's testimony still would not have established that she had the specific intent to kill or inflict great bodily harm on the victim, especially since the autopsy showed that the victim died from strangulation with a tightly wrapped shirt. However, Thayne's testimony that defendant apparently considered using a knife against the victim tends to negate this claim; and, moreover, defendant would, at the minimum, be culpable as a principal if she battered and/or held the victim to facilitate his being strangling by Lee.
[7] See American Bar Assoc. Journal, April 2000.
[8] Although defense counsel did not state a specific ground for this objection, it is obvious that he was objecting to reference of defendant's drug usewhich is other crimes evidence. Additionally, the Supreme Court has held that a general objection may be sufficient to preserve an other crimes issue. State v. Duke, 362 So.2d 559 (La.1978). Although Duke was later overruled to the extent that it held that introduction of other crimes evidence is never harmless error, see State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 99, "[i]t is unclear whether Johnson overruled Duke on the objection issue and will mean that the defendant must move for a mistrial to preserve the issue for review." State v. Powell, 28,788 p. 6, n. 3 (La.App. 2 Cir. 11/1/96), 683 So.2d 1281, 1286. But the question here is ultimately moot, since defense counsel did move for a mistrial after his objection.
[9] Because other, overwhelming evidence was presented to show defendant's concealment of the murdernot the least of which was defendant's second statementthis testimony, though relevant and technically admissible, could nonetheless have been disallowed by the trial court under art. 403 because of the danger that its cumulative effect would unduly confuse the jury as to the relevant issue.
[10] In State v. Tyler, 97-0338, pp. 13-14 (La.9/9/98), 723 So.2d 939, 947, the Supreme Court held that evidence of the defendant's participation in a drug sale twenty-four hours after he committed murder was inadmissible under La. C.E. arts. 403 and 404(B), including the res gestae exception in the latter. However, the court found that, given the strong evidence of the defendant's guilt, the admission of the evidence was harmless error.