# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-867

**STATE OF LOUISIANA**

**VERSUS**

**MILES J. GUIDRY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 156140
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHANNON J. GREMILLION**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and John E. Conery, Judges.

Conery, J., concurs.

**CONVICTION AND SENTENCE AFFIRMED.**

**Keith A. Stutes**
**Fifteenth Judicial District Attorney**
**Michele S. Billeaud**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Miles J. Guidry**

**Miles J. Guidry**
**Louisiana State Prison**
**Camp D Hawk 3-R-3**
**Angola, LA 70712**
**PRO SE:**
    **Miles J. Guidry**

**GREMILLION, Judge.**

Defendant, Miles J. Guidry, was charged by indictment on March 23, 2016, with one count of second degree murder, a violation of La.R.S. 14:30.1. On May 24, 2016, he waived formal arraignment and entered a plea of not guilty. Defendant filed numerous motions, including a "Motion for Prieur Hearing," "Motion to Suppress Search of Vehicle In Colorado," "Motion to Suppress Gruesome but Otherwise Extremely Prejudicial Photographs and Evidence," "Motion to Exclude the Note Recovered from the Suzuki XL-7 by Glendale Police," "Motion in Limine to Exclude Irrelevant and Inadmissible Character Evidence," "Motion in Limine to Exclude Evidence of Prior Bad Acts as it is Inadmissible Hearsay," and "Motion in Limine to Preclude the Forensic Pathologist from Offering Any Opinion Testimony Outside His Written Reports." All of the motions were denied by the trial court. Defendant then sought supervisory writs with this court as to the gruesome photographs, and this court remanded the matter, ruling that the trial court must make an individual determination as to each of the over 400 photographs.

Trial began on May 7, 2018, and on May 15, 2018, a unanimous jury returned a verdict of guilty. At the May 29, 2018 sentencing hearing, the trial court ruled on Defendant's May 25, 2018 motion for a new trial, advising him that the motion was denied. Defendant then made an oral motion for a post-verdict judgment of acquittal, which was also denied. Defendant was then sentenced to the statutorily-mandated life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence, and the trial court instructed him that he was given credit for time served. On May 29, 2018, Defendant filed a Motion for Appeal and Designation of Record which the trial court granted on May 31, 2018. Defendant assigns the following errors, which we address in differing order:

1.	The trial court erred in allowing inadmissible other crimes evidence to be admitted.

2.	The trial court erred in denying defense counsel's challenges for cause.

3.	The trial court erred in denying defense counsel's Motion in Limine regarding the note found in Miles Guidry's vehicle.

4.	The trial court erred in allowing Detective Neil St. Cyr to testify as an expert in several areas.

5.	The trial court erred in allowing Dr. Christopher Tape to testify to information not in his autopsy report.

6.	The trial court erred in that the evidence, when viewed in a light most favorable to the prosecution, was insufficient to find Miles Guidry guilty of second degree murder.

7.	The trial court erred in denying defense counsel's Motion to Suppress Gruesome or Otherwise Extremely Prejudicial Photographs and Evidence.

## FACTS

On November 28, 2015, the victim, Claire Walley, and Defendant brought their four-week-old son to the victim's mother's house so that the couple could go out and celebrate Defendant's birthday. At approximately 11:40 p.m., the victim and Defendant returned to pick up their son, talked to the victim's mother about returning the next day to watch the Saints game, and then went home.

The next morning at about 6:00 a.m., Defendant's mother received a call from Defendant instructing her to come over to his home he shared with the victim and told his mother to enter through the back door. Once Defendant's mother arrived, she tried to enter through the back door, but it was locked, so she let herself in through the side door and discovered a trail of blood on the floor that lead to the victim. Defendant's mother then observed the victim lying on the floor in a pool of blood, with more blood coming from a cut on her neck, and a knife nearby. After calling her husband for support, she then called 911 as she tended to her grandson

2

who she found crying, but unharmed, in a back room of the house. One of the responding officers, Deputy Jordan Ancelet, arrived and found two deputies on the scene. The three officers then entered the residence and found the deceased victim on the floor. The officers began to search the house to make sure there were no other occupants. After completing the sweep of the house, the officers exited the house to avoid contaminating the crime scene. The officers then ran the information on Defendant's vehicle to attempt to locate it, and cameras located the vehicle, via its license plate, going into Texas at about 3:49 a.m. Defendant was subsequently stopped for speeding in Woodville, Texas and issued a citation; however, the officer was delayed in receiving information that there was a warrant for Defendant's arrest. Defendant was eventually located in Glendale, Colorado, when Officer Trace Warrick observed Defendant's vehicle parked in an empty parking lot at 4:00 a.m. on December 7, 2015. After the officer ran the license plate and learned of the warrant for a homicide connected with a possible occupant of the vehicle, Defendant was handcuffed, and the vehicle was treated as a crime scene. Defendant was then sent back to Lafayette and booked into jail.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error six, Defendant contends the evidence introduced at trial was insufficient to sustain his conviction of second-degree murder. We consider this assignment of error first, in accordance with *State v. Hearold*, 603 So.2d 731 (La.1992).

> The analysis for a sufficiency of the evidence claim is well-settled:
>
> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v.*

3

> *King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weight the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Under La.R.S. 14:30.1, second degree murder is relevantly defined as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" As the fourth circuit noted in *State v. White*, 14-397, p. 17 (La.App. 4 Cir. 7/29/15), 174 So.3d 177, 189 (footnote omitted), *writ denied*, 15-1577 (La. 10/10/16), 207 So.3d 408, "to prove second degree murder the state must prove the killing of a human being either with specific intent or when the offender is engaged in one of the listed crimes." "The severity of the attack on the victim is an indicator of the defendant's specific intent to kill." *State v. Corley*, 97-235, p. 6 (La.App. 3 Cir. 10/8/97), 703 So.2d 653, 659, *writ denied*, 97-2845 (La. 3/13/98), 712 So.2d 875.

In the instant case, Defendant contends that "[t]he essential elements of the crime of second degree murder were not proven beyond a reasonable doubt. In the alternative, it is respectfully submitted the trier of fact erred in finding Miles guilty of second degree murder instead of manslaughter as the record supports such a reduction."

First, Defendant argues that too many errors were committed at the investigatory stage and at trial to allow a verdict of guilty beyond a reasonable doubt. To support his claim, Defendant highlights several alleged errors, many of which will be addressed in the assignments of error that follow due to Defendant's claims

4

regarding the inadmissibility of certain pieces of evidence and claims regarding rulings made by the trial court on some of Defendant's motions.

He first notes that a detective with the Lafayette Police Department, Detective Chris Beasley, testified that a suspect was immediately identified, which negated the need to prioritize the identification of a fingerprint found on one of the homicide weapons. Defendant also argues that the fingerprint that was found did not match Defendant and was not able compared to the victim because the victim was laid to rest without being fingerprinted.

Secondly, Defendant points to the fact that all of his motions were denied by the trial court.

Defendant next points out that one juror was a member of law enforcement (Kimberly Sassau) and another was a relative of the victim (Fritz Farrar). This issue is fully and more appropriately discussed in assignment of error number two.

The next alleged error Defendant urges is his assertion that highly prejudicial "other crimes" evidence was admitted. The alleged inadmissible "other crimes" evidence is testimony from Detective St. Cyr, an investigator for the Lafayette Sheriff's Department, regarding marijuana he found when he opened some of the evidence boxes he received pursuant to the warrant executed by the Glendale Police Department. Defendant objected to the admissibility of the testimony as highly prejudicial "other crimes" evidence because possession of marijuana is illegal in Louisiana; however the trial court ruled it admissible with the agreement that the State would bring out the fact, through questioning, that Defendant was not committing a crime when he purchased and then possessed the marijuana since he was in Colorado, where it is legal. The admissibility of this evidence is addressed below. The evidence regarding the possession of marijuana was properly admitted.

5

Defendant alleges that the crime scene was contaminated because of the unknown number of people who entered the residence after the murder. He bases this argument on testimony by Deputy Jordan Ancelet with the Lafayette Sheriff's Office indicating that he did not know how many people entered the house prior to his arrival. Further, Defendant points to Deputy Ancelet's testimony that he lacked training in crime scene integrity, and the only formal training he received was a basic course in the police academy about things like what not to step on when securing a crime scene. Deputy Ancelet did testify that he was only in the home long enough to verify that no one else was inside so as not to contaminate the scene any further than it might be contaminated during their sweep, then he and two other officers secured the scene by putting up crime scene tape to secure a primary and secondary perimeter. Defendant states that Detective Shea of the Lafayette Police Department testified that he was the only person at the crime scene wearing protective garments; however, his testimony, when asked whether he had on protective garments was, "We wore gloves and, I call them booties." Actually, it was Detective Beasley who testified that when the scene was being processed, he was the only person wearing Tyvek sleeves and a surgical mask in addition to the booties they wore.

According to Defendant, another error was the admission into evidence of a highly prejudicial, unauthenticated note found in Defendant's vehicle. The note in question was found pursuant to the search executed by the Glendale Police Department on Defendant's vehicle following his arrest in Colorado. The note, which was read out loud by Detective Wroblewski with the Glendale Police Department, explained Defendant's actions and stated in relevant part:

> This letter is not intended to be my excuse for why I did what I did, just an insight to the monster that built up inside of me and the cause that unleashed him. Claire did not deserve what she received, and now I am here full of regret and sorrow who [sic] are stricken with

pain by my actions. Worst of all, I fear for our son and the life of opportunity that I have denied him. . . .

Before Wyatt was born, there was great stress between us. Our arguments increased in frequencies up until a few weeks before his birth. . . . She didn't want others to know about our problems though every now and then I would get so worked up feeling disrespected that I would forcefully grab her wanting her to understand my anger, but that would only lead her to fear me and want to leave. . . . I would get physical. It wasn't her faults [sic] that angered me. I loved her and accepted them. It was her inability to admit to them. . . . To make matters worse, I was constantly in school the entire time she was pregnant and that carried stress into us. . . . Whenever I wasn't consumed by school work, I would be at home, cook for her, tend to her needs, and all I wanted in return is to let me put all my attention on school for a few days so that I can achieve. Every time I would start getting into a rhythm, she would bring something up that pushes my buttons. . . . It made me feel so unsupported in my school work after as supportive I felt I've been with her and the pregnancy whenever I have a chance. . . . It grew resentment in her towards me, that her life is now over because of the baby. It would anger me so much that she was taking away the joy of being a parent. . . . [N]o matter what I said or did, that negative feeling towards me persisted. . . . I felt unwanted. . . . I just wish she would have taken the time to respect how my busy life consumes my time necessary away from her. It was this constant feeling of a lack of respect that I had, after I felt I had done well enough to deserve it. That grew into rage. . . .

Defendant also cites the failure of twenty-two swabs of DNA to be submitted for testing as another error supporting his claim that the evidence was not sufficient to find him guilty of second degree murder. Detective Beasley testified that he did not submit twenty-two of thirty-seven DNA swabs for testing; however, he did state that later in the investigation other people would sometimes submit swabs to the lab after finding out additional information. Defendant also notes that there was a backpack found near the victim's head that was never swabbed.

Defendant next points to the testimony of Winnie Kurowski, a forensic chemist with the Acadiana Crime Lab. On direct examination, Ms. Kurowski testified about the testing of blood samples on a bread knife found at the scene. Ms. Kurowski stated that the DNA profile on that knife matched the profile of the victim,

and no other DNA profiles were found on these samples. Ms. Kurowski was questioned on cross-examination about testing of blood evidence. She testified that the crime lab tested samples that they deemed to be of probative value. Out of twenty-three items, seven were not tested for the presence of blood, because the crime lab did not suspect that they would be probative in nature; however, Ms. Kurowski did state that the defense, prosecution, or law enforcement agencies involved in the investigation could request testing on any items that had not been tested. Some of these items that were not tested included an infant onesie, a swab from a PT Cruiser, a swab from a set of blinds, a swab from a first aid kit latch, the victim's fingernails, and a swab from a bottle. Ms. Kurowski further testified that there was DNA present on the blade of the kitchen knife that did not match either the victim or Defendant. She further testified that to avoid cross-contamination of the samples, they wear gloves and masks, they wear their hair back, they keep their nails short, and they do not eat or drink near the samples. Despite these precautions, Ms. Kurowski stated that cross-contamination can still occur, and in the situation here with the mixed DNA profile, because the lab was not able to attribute the DNA profile to anyone associated with the case, they included in the report that the DNA profile could have been from contamination from a lab employee.

Finally, according to Defendant, Dr. Christopher Tape, a forensic pathologist who performed the autopsy on the victim, was erroneously allowed to testify to information that was not included in his autopsy report, admitted to making mistakes, and his autopsy report indicated no prior trauma to the victim's abdomen despite her having had a C-section four weeks before. On direct examination, Dr. Tape testified that he performed an autopsy on the victim and found that she had suffered fatal incise wounds, which are slices made with a knife or other bladed object, across the whole front of her neck. These wounds were multiple cuts that

8

formed the same wound, and these cuts damaged the vascular structures and airway in her neck. Dr. Tape stated that his interpretation of the neck wounds was that they were formed from multiple sawing motions across the neck and that the purpose of doing that would be to kill, possibly in an attempt to decapitate the person. Dr. Tape later testified regarding the manner in which the wounds may have been inflicted. When the State asked him what the left side of the cut being deeper than the right side would indicate, he stated that it would be consistent with someone making cuts from behind the victim using their right hand. Defendant objected to this hypothesis because Dr. Tape had not included it in his report, but the trial court overruled the objection. Similarly, Defendant objected to Dr. Tape's testimony regarding his opinion that the wounds were not done in an instant because the sawing motion takes time and there were several cuts because Defendant stated that this testimony was also outside the information contained in his report. The trial court also overruled this objection. These issues are discussed in assignment of error number six.

In its reply brief, the State argues that the evidence supporting Defendant's guilt is abundant. For example, the State points to the testimony of DNA analysts, Carolyn Booker and Ms. Kurowski, who both testified as to their analyses of the blood evidence. The State notes that Ms. Kurowski testified that the analysis of the blood found on Defendant's clothes that he was last seen wearing and the blood on the serrated knife found at the scene showed that it was victim's blood. Further, she testified that blood found on the victim's abdomen belonged to Defendant. When Defendant was arrested, he had an injury to his hand that he stated was from a self-inflicted cut that he sustained after midnight on November 29th, but he would not provide further details about how it was sustained. Booker testified that her analysis of the DNA found on the straight-edge knife belonged to both the victim and Defendant. Regarding the note found in Defendant's vehicle, the State argues that

9

the note provided an explanation from Defendant as to why he committed the acts in question.

The State also points to the circumstantial evidence presented at trial. The victim was found wearing the same clothes she was last seen in by her mother the night before, which would indicate that the murder happened not long after she arrived home for the night. Further, the trail of blood led from the victim's body through the house to Defendant's bloody clothes and to the couple's baby. As noted above, when Defendant was arrested, he had an injury to his hand. The jury was presented with information about Defendant fleeing despite making plans to see the victim's mother the next day and that when Defendant was found, he appeared to be living in his car and was in possession of the victim's wallet as well as the previously-mentioned note that explained Defendant's actions. The State further notes that the jury was also presented with evidence regarding the victim's injuries, including a punctured lung, punctured liver, and cuts to her neck so severe that Dr. Tape could not testify to how many wounds were inflicted there.

Alternatively, Defendant argues that he is entitled to a reduction of the conviction to the lesser included offense of manslaughter. Louisiana Revised Statutes 14:31(A) defines manslaughter, in pertinent part, as follows:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed . . . .

Sudden passion and heat of blood are mitigating factors that defendant must prove by a preponderance of the evidence. *State v. Cofer*, 16-871 (La.App. 3 Cir. 4/5/17), 216 So.3d 313, *writ denied*, 17-1150 (La. 5/11/18), 241 So.3d 1014.

10

Defendant argues that given the couple's plans to return to the victim's mother's house the next day, if Defendant did commit the crime, it must have been done in sudden passion and heat of blood. To further support this claim, Defendant hypothesizes that the stress of school, work, and a newborn became too much, and an argument ensued which caused him to snap and kill the victim.

There is no evidence in the record supporting a reduction to manslaughter. Aside from Defendant's hypothesis, there is nothing in the record that even approaches a preponderance of the evidence for any mitigating factors.

Considering the evidence presented in this case and the jurisprudence above, the unanimous guilty verdict was a rational decision pursuant to *Kennerson*. As the record supports a rational conclusion that Defendant had the specific intent to kill or inflict great bodily harm of the victim, this assignment of error is without merit.

## OTHER CRIMES EVIDENCE

In Defendant's first assignment of error, he alleges that the trial court erred in allowing inadmissible other crimes evidence to be admitted. The admission of this evidence occurred when the State's witness, Detective St. Cyr, was being questioned on direct examination. The following exchange took place:

Q. Okay. So was that evidence that was collected pursuant to that search warrant, was it sent to you?

A. Yes, ma'am.

Q. Tell me how that – what's that process? What happens when you're getting evidence from another state or another jurisdiction?

A. They box it. And in this situation, they put it in two separate boxes that are sealed by the crime scene tech that obtained the evidence. She then initials it, that it's sealed. She ships it to us which in this case was Fed-Ex. We sign for it upon its arrival, and then I took pictures of the box that's still sealed and signed.

Q. So when you get the boxes – and it's Fed-Ex'd to you, is what you said?

11

A. Yes, ma'am.

Q. When you get that box, you open that box and how is the evidence stored in that box?

A. It's all individually packaged.

. . . .

Q. Did you open any of them?

A. I did open some of them, yes.

. . . .

Q. So I want to talk about maybe the ones that you did open. Did you open – well, which ones did you open?

A. I don't necessarily recall all the items I opened. I know I opened the notebook, the laptop, maybe the package of marijuana.

MR. LUSKIN: Objection, Judge. Can we have a sidebar?

THE COURT: On the record I'm sure, right?

MR. LUSKIN: On the record.

THE COURT: Okay. Remove the jury, please.

(AT THIS TIME THE JURY WAS ESCORTED FROM THE COURTROOM.)

DEPUTY SHERIFF: Twelve jurors and two alternates have exited the room.

THE COURT: All right. Please be seated, ladies and gentlemen.

MR. LUSKIN: Judge, I think you can guess my objection here. The State's witness just testified to a package of marijuana. Before he testified to the package of marijuana, he made it clear where that marijuana came from. In fact, the State walked him through how secure the process was getting from the car to here. Marijuana, possession of marijuana is a crime.

THE COURT: Not in Colorado.

MR. LUSKIN: It's 404 evidence that was not sought to be admitted by the State, that was not part of their 404 motion. The witness just testified to it in front of the jury. We're moving for a mistrial, Judge.

THE COURT: I'm sorry?

12

MR. LUSKIN: That's our basis for a motion for a mistrial.

MS. BILLEAUD: Your Honor, the State's position is, you know, I did not know that Detective St. Cyr was going to mention that, and – but the marijuana is legal in Colorado and that's where it was obtained. And I believe even in the car, and I'm willing to – you know, we can find that and introduce that as well, that there was a receipt that it was bought in Colorado.

I think that any error that was made can be easily corrected by giving an instruction to the jury that that is not a crime in Colorado and that he didn't break any laws, so it should not be held against him or be considered a crime in any manner or any kind of wrong doing at all because it wasn't. It was a completely legal action that he did while he was in Colorado. And I think that would cure the problem. I mean, it shouldn't be held against him. We're telling them that. It's not a crime there.

THE COURT: Well, it also could be cured if you would just ask him about that receipt, if they found out whether it was bought in Colorado.

MS. BILLEAUD: I absolutely can.

THE COURT: And then he says yes, and then you ask him why he didn't arrest Miles for possession of marijuana, and then he says because it's legal in Colorado and not a crime over there. And then you go on and then everything's solved and I don't have to give them a limiting instruction.

MS. BILLEAUD: Okay.

MR. LUSKIN: Judge, if I can briefly. It's legal under federal law.[1]

THE COURT: What?

MR. LUSKIN: Possession of marijuana is legal under federal law, right. The fact that it's legal in Colorado doesn't necessarily render it harmless. This was specifically addressed. This has been specifically addressed repeatedly. I put it in my motion in limine for this exact reason. We had a 404 hearing in order to clarify what exactly the State was going to seek to use in terms of prior bad acts. This wasn't part of that. This was never intended to be part of that. It's too late. We can't unring the bell. This is now – this is the third or the fourth piece of evidence that's been brought out through this witness. Each one of those pieces of evidence I've taken an issue

---

[1]The transcript shows that defense counsel incorrectly stated that possession of marijuana was legal under federal law; however, in a following argument, discussed below, when using the same line of reasoning, counsel correctly states that possession of marijuana is a federal crime.

with, unauthenticated evidence, hearsay evidence, and now we've got 404 evidence. The jury's heard all of that.

A limiting instruction is going to be unsuccessful. It's not going to cure the prejudice. Further questioning of Detective St. Cyr is not going to cure the prejudice. It's too late. I think we need a mistrial. That's the only way to fix this. We can start fresh.

THE COURT: Denied. Anything further before we bring the jury in?

MR. LUSKIN: Not at this time, Judge.

THE COURT: All right. Bring the jury in.

The State then asked the following:

Q.      Detective, before we broke you mentioned that one of the items that you located was marijuana?

A.      Yes, ma'am.

Q.      Did you arrest Mr. Guidry and charge him with possession of marijuana?

A.      No, ma'am.

Q.      Why not?

A.      The marijuana was located in a vehicle in Colorado. There was a receipt with the marijuana indicating that he purchased it in Colorado. And as far as my knowledge, it's not illegal to possess or purchase marijuana in Colorado.

Q.      So it was not a crime—

A.      No, ma'am.

Q.      —that he had committed at that point?

A.      No, ma'am.

Later, Defendant again argued for the need for a mistrial pursuant to La.Code Crim.P. art. 770, which states in pertinent part:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, attorney, or a court official, during the trial or in argument, refers directly or indirectly to:

14

. . . .

> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

. . . .

> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the comment but shall not declare a mistrial.

He further argued that possession of marijuana is a federal crime, that Defendant is being prosecuted in Louisiana where possession of marijuana is a crime, and that Louisiana procedural and substantive laws were being applied. The trial court again denied Defendant's motion for a mistrial.

In his brief, Defendant contends that under La.Code Evid. art. 404(B), "other crimes" evidence is generally prohibited from being introduced unless it is being introduced to show the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." *See State v. Harris*, 383 So.2d 1 (La.1980). He notes that this court previously said, "[t]he prohibition against evidence of other crimes is largely based upon the excessively prejudicial effect upon the accused's constitutional presumption of innocence of the crime for which (alone) the accused is on trial." *State v. Dixon*, 628 So.2d 1295, 1298 (La.App. 3 Cir. 1993) (citing *State v. Morris*, 362 So.2d 1379, 1380 (La.1978)). Defendant asserts that the marijuana found in his possession was inadmissible because it was not introduced to show any of the enumerated exceptions to the prohibition against other crimes evidence.

The weight of Defendant's argument rests on his assertion that the legal status of marijuana in Colorado, where Defendant was found possessing it, is of no moment when he is being prosecuted in Louisiana, under Louisiana law, where it is against both Louisiana state law and federal law. *See* La.R.S. 40:966; 21 U.S.C. § 811.

Additionally, Defendant notes that Colo. Const. art. 18, § 16[2] still requires that individuals be twenty-one years of age or older to buy or sell marijuana and that they have a government issued identification to show proof of age. Defendant then points to the fact that his driver's license was expired, which the officer who issued the citation in Woodville, Texas testified to at trial, making it illegal for him to purchase in Colorado.

Defendant points to *State v. Womack-Grey*, 99-416 (La.App. 4 Cir. 5/17/00), 764 So.2d 108, where the fourth circuit held that testimony regarding the defendant's illegal drug use, which was unrelated to the crime being prosecuted, was inadmissible as other crimes evidence because its prejudicial effect far outweighed its relevance. In that case, the court granted a mistrial under La.Code Crim.P. art. 770(2). *Id.* This case was subsequently overturned by the supreme court which held that the testimony regarding the drug use was harmless error because the defendant's own admissions, which established her involvement in helping her cohort conceal the murder for which she was convicted, were far more compelling than the testimony of her illegal drug use, which was unrelated to the crime. *State v. Womack-Grey*, 00-1507 (La. 12/7/01), 805 So.2d 1116.

In its reply, the State argues that Defendant failed to accept the admonition offered by the court, and instead, objected to it, moving only for a mandatory mistrial which was denied by the trial court.

The State then notes that under La.Code Evid. art. 404(B)(1), other crimes evidence is prohibited when it is being offered to demonstrate a person's character and that he acted in conformity therewith. Here, the State asserts, and we agree that the question was meant to demonstrate to the jury that the officer had only opened a

---

[2]In his brief, Defendant cites article 185 of the Colorado Constitution; however, article 185 does not exist. Rather, Colo. Const. art. 18, § 16 contains the point of law he is referring to.

16

few pieces of evidence prior to trial and was not meant to speak to the character of Defendant. Further, following Defendant's objection to the admission of the testimony regarding the marijuana, the State asked the officer follow-up questions that demonstrated to the jury that Defendant had committed no crime or wrongdoing by possessing the marijuana in Colorado. The State asserts that it was not required to provide notice of the testimony, nor was the testimony in violation of La.Code Evid. art. 404(B), because no law was broken.

The jury was provided with testimony that Defendant did not commit a crime while in possession of marijuana in Colorado. The admission of testimony that he was in possession of marijuana does not violate La.Code Crim.P. art. 770, which states that a mistrial is mandatory when the judge, prosecutor, or a court official makes a direct or an indirect reference to an inadmissible **crime** committed by the defendant.

Additionally, the State contends that Defendant's second request for a mistrial was not timely because the record reflects that it was made fifteen pages following the State's follow-up questions, rather than contemporaneously with the questions. According to the State, even if the testimony regarding the marijuana is found to be other crimes evidence, admitting it into evidence amounted to harmless error given the other "overwhelming evidence" in this case.

As noted by the State, this court stated:

[I]t is well established jurisprudence in Louisiana that inadmissible other-crimes evidence is subject to a harmless error analysis. In *State v. Peloquin*, 04–667, pp. 5–6 (La.App. 3 Cir. 11/17/04), 888 So.2d 393, 397, *writ denied*, 04–3170 (La.4/8/05), 898 So.2d 1280, this court discussed harmless error in the context of inadmissible other-crimes evidence, as follows:

In *State v. Johnson*, 94–1379 (La.11/27/95), 664 So.2d 94, the trial court erroneously admitted other crimes evidence introduced by the State to attack the credibility of the defendant under La.Code Evid. art. 609.1. In *Johnson*, the

17

supreme court held "that the introduction of inadmissible other crimes evidence results in a trial error subject to harmless error analysis." *Id.* at 102. In its ruling, the supreme court set out the following regarding the harmless error analysis:

> The history of Louisiana's harmless error rule makes clear that there has been one common directive: appellate courts should not reverse convictions for errors unless the accused's substantial rights have been violated. This comports with the general theory that "appeals in criminal cases are not granted merely to test the correctness of the trial court's ruling, but only to rectify injuries caused thereby." *State v. Saia*, 212 La. 868, 876, 33 So.2d 665, 668 (1947), citing *State v. Cullens*, 168 La. 976, 123 So. 645, 648 (1929).
>
> This Court adopted the federal test for harmless error announced in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as a practical guide for determining whether substantial rights of the accused have been violated. *See State v. Gibson*, 391 So.2d 421 (La.1980). *Chapman* tests whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 386 U.S. at 24, 87 S.Ct. at 828. An error did not "contribute" to the verdict when the erroneous trial feature is unimportant in relation to everything else the jury considered on the issue. *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991), *overruled as to standard of review for erroneous jury instructions in Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).
>
> *Chapman* was refined in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The *Sullivan* inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.*, 508 U.S. at 279, 113 S.Ct. at 2081. This Court adopted the *Sullivan*

refinement of *Chapman. See State v. Code*, 627 So.2d [1373,] 1384; *State v. Bourque*, 622 So.2d [198,] 241 fn. 20.

*Id*. at 100.

*State v. Barnes*, 13-576, pp. 3-5 (La.App. 3 Cir. 12/11/13), 127 So.3d 1070, 1073–74, *writ denied*, 14-43 (La. 6/13/14), 140 So.3d 1188.

In the case at bar, the State argues that a substantial amount of evidence was presented that established Defendant's guilt. For example, evidence was presented that showed Defendant's blood was present on the victim's body and on the murder weapons, the clothes Defendant was last seen in were found at the crime scene covered in the victim's blood, Defendant's blood was found throughout the house, and Defendant was the last person seen with the victim. Additionally, when Defendant was arrested, a handwritten note stating his regret for what he had done was found in his vehicle.

Defendant's right to a fair trial was not compromised by the admission of the testimony regarding the marijuana. The brief mention of the marijuana possession during the officer's testimony did not constitute other crimes evidence because Defendant possessed it in a jurisdiction that allows for such possession. Further, as previously discussed, Defendant's reliance on *Womack-Grey*, 764 So.2d 108, was incorrect since the supreme court overturned the appellate court's ruling on the grounds that the brief mention of the illegal drug use in that case amounted to harmless error when the jury was presented with so much other evidence supporting the defendant's guilt. Similarly, as the State notes, the amount of evidence demonstrating Defendant's guilt far outweighs any prejudice caused by the brief mention of the fact that Defendant possessed marijuana, especially when that prejudice was mitigated through follow-up questions that resulted in direct testimony

that Defendant did not commit a crime when he was in possession of the marijuana. This assignment of error is without merit.

## JUROR CHALLENFGES

In Defendant's second assignment of error, he alleges that the trial court erred in denying Defendant's challenges for cause. Louisiana Code of Criminal Procedure Article 797 governs challenges for cause and states:

> The state or the defendant may challenge a juror for cause on the ground that:
>
> (1)     The juror lacks a qualification required by law;
>
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
>
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
>
> (4) The juror will not accept the law as given to him by the court; or
>
> (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

Defendant argues that the jurors at issue were not impartial. Defendant notes that the trial court has broad discretion in ruling on challenges for cause and such rulings are only reversed where the voir dire record, as a whole, demonstrates that there was an abuse of discretion. *State v. Robertson*, 92-2660 (La. 1/14/94), 630 So.2d 1278; *State v. Ross*, 623 So.2d 643 (La.1993). Defendant states that because he exhausted all of his peremptory challenges, his only burden is to show that the trial court abused its discretion in denying any of his challenges for cause.

*Kimberly Sassau*

During voir dire, Kimberly Sassau testified that she was a communications deputy with the sheriff's department. When asked if she could still be impartial as a juror, she stated, "[p]ossibly not. . . . I work with them closely, so more than [likely] not." Additionally, she testified that her fiancé was a sheriff's deputy, but she stated that this relationship would not affect her testimony. When asked later about her previous statement that she may not be able to be impartial, the following colloquy took place:

> A. Right. When I say that, I kind of thought about it. If they're going to read their affidavits like they have read them, I believe it'll be the truth. I don't believe that – I mean, they're sworn deputies just like I am and that's what I meant.
>
> Q. So the police officers are going to tell the truth?
>
> A. I can't say that they will for sure, but like I said they're sworn deputies and I believe their testimony.
>
> . . . .
>
> Q. I guess what you were saying yesterday was the reason you said "possibly maybe" because you know all these deputies and you're going to believe what they have to say?
>
> A. Yes.
>
> Q. More than an average Joe?
>
> A. More than an average Joe.
>
> Q. So you're going to believe a police officer over a random person testifying?
>
> A. It depends on the facts. Like I said, if they're going to read exactly what they wrote on that day, then there's no question about what they're saying.
>
> Q. So what if they were not telling the truth on the report?
>
> A. If they weren't telling the truth on the report, it's somebody's job to catch them in that.

Sassau also stated that if the State failed to prove its case and she had any doubt that a defendant was not guilty, she would not be able to return a guilty verdict.

Defendant argued that because of Sassau's testimony regarding her relationship to law enforcement and her views about defendants, she is unable to be an impartial juror. Defendant did acknowledge that Sassau stated that she could find a defendant not guilty if the state failed to prove their case but argued that this does not cure her impartiality.

To support this claim, in Defendant's brief he cites *State v. Hallal*, 557 So.2d 1388, 1389-90 (La.1990), in which the supreme court held that "[a] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied."

The State contends that although Sassau initially stated that her and her relatives' employment in law enforcement could affect her ability to remain impartial, she later clarified that she would believe law enforcement's sworn testimony, which does not amount to bias because it is not unreasonable that any juror would think sworn testimony is truthful. Sassau also clarified that if there was contradictory evidence presented, such evidence could cause her to doubt the truthfulness of the testimony. The State also notes that Sassau left room for Defendant to explain why he may have fled, even if she was suspicious of his guilt because he fled.

This court held in *State v. Dotson*, 16-473, p. 5, 17 (La. 10/18/17), 234 So.3d 34, 39, 45, *writ denied*, 18-177 (La. 12/17/18), 259 So.3d 340:

> A trial judge is vested with broad discretion in ruling on challenges for cause, and such a ruling is subject to reversal only when a review of the entire *voir dire* reveals the judge abused his discretion. **[State v.] Robertson**, [92-2660, (La. 1/14/94),] 630 So.2d [1278], 1281. The trial judge's refusal to excuse a prospective juror on the

ground he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the prospective juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. **Id**.

. . . .

Clearly, La. C.Cr.P. art. 797(2) does not require that a prospective juror state with absolute certainty that he/she cannot be impartial in order to be removed for cause. However, in the absence of such a statement, the trial court's denial of a challenge for cause will not be reversed if, on review of the entire *voir dire* examination, the prospective juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. **[State v.] Passman**, 345 So.2d [874,] 880 [(La.1977)]. Reversal is appropriate only where it appears, upon review of the *voir dire* examination as a whole, that the trial judge's exercise of that discretion has been arbitrary or unreasonable, resulting in prejudice to the accused. *Id.*; see **Dorsey**, 10–0216 at 28, 74 So.3d at 625; **State v. Lee**, 93-2810 (La. 5/23/94), 637 So.2d 102, 108. This standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys." **Lee**, 93–2810 at 9, 637 So.2d at 108. "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record." *Id.* As noted in **State v. Miller**, 99-0192 (La. 9/6/00), 776 So.2d 396, because of the "complicated and oftentimes daunting" task faced by a trial court in deciding "challenges for cause of prospective jurors who give equivocal . . . responses during *voir dire*," "an appellate court should accord great deference to the [trial] court's ruling on a challenge for cause, which is necessarily based, in part, on the court's personal observations during questioning." *Id.*, 99–0192 at 14, 776 So.2d at 405–06.

Like in the present case, in *State v. Dorsey*, 10-216 (La. 9/7/11), 74 So.3d 603, *cert denied*, 566 U.S. 930, 132 S.Ct. 1859 (2012), the supreme court found no abuse of discretion where the trial court denied a challenge for cause of a juror who initially said he would give more weight to the testimony of a law enforcement officer than that of a lay witness but later said he could change his mind if the evidence contradicted the officer's testimony and that officers can sometimes make mistakes. Here, as previously noted, Sassau initially stated that she would believe the sworn testimony of an officer over that of a lay person because of her employment with the sheriff's department, but then she later stated that whether she believed them over a

23

lay person would depend on facts and if they were being untruthful in a report then she would expect someone to catch such deception.

The second circuit stated in *State v. Colby*, 51,907, p. 31 (La.App. 2 Cir. 5/30/18), 244 So.3d 1260, 1281, *writ denied*, 18-1256 (La. 3/25/19), __ So.3d __:

> A potential juror who is associated with law enforcement duties must be closely scrutinized and may justify a challenge for cause; however, such association is not automatic disqualification. *State v. McIntyre*, 365 So.2d 1348 (La. 1978); *State v. Hampton*, 50,561 (La. App. 2 Cir. 5/18/16), 195 So.3d 548, *writ denied*, 2016-1181 (La. 5/26/17), 221 So.3d 854. A prospective juror's association with law enforcement is grounds for disqualification only if one might reasonably conclude that it would influence him in arriving at a verdict. *State v. Hampton*, *supra*; *State v. Rhodes*, 1997-1993 (La. App. 4 Cir. 11/18/98), 722 So.2d 1078. Louisiana courts have generally disqualified persons who are currently actively associated with law enforcement. However, courts have also held that there is no abuse of discretion in denying a challenge for cause where "a juror's association with law enforcement has ended by the time of trial, he has no personal knowledge of the case at hand, and he states that he can be impartial despite the prior law enforcement background." *State v. White*, *supra*; *State v. Rhodes*, *supra*.

Sassau testified that her fiancé was a sheriff's deputy; however, she unequivocally stated that this would not influence her impartiality as a juror. Upon review of the entirety of Sassau's testimony during voir dire, the record shows no instance of abuse of discretion by the trial court regarding its denial of Defendant's challenge for cause concerning Sassau.

*Shawana Bokenkamp*

Shawana Bokenkamp testified that she would return a verdict of guilty if the State proved their case by clear and convincing evidence. However, when asked what clear and convincing evidence meant to her, she agreed with another prospective juror's definition of clear and convincing evidence when he stated that the evidence would be clear and convincing if it was "overwhelming evidence that's presented." Defense counsel went through some fact patterns with the prospective jurors, and during one of the fact patterns, he asked whether someone arrested on

suspicion of OWI who was out on bond should be allowed to bond out again if they are in an accident that causes a fatality. Bokenkamp responded that accidents can happen without alcohol involved even if the person was previously arrested on suspicion of OWI, and in that case, they should not be penalized, but if this was a second case of suspicion of OWI, then that person should have some restrictions but did not need to be in jail. In a second fact scenario, Defendant presented a situation where someone is suspected of murder and witnesses stated the suspect committed the murder, but the case had not yet gone to trial, and he asked the prospective jurors if that suspect should be able to bond out of jail while awaiting trial. Bokenkamp stated that the suspect should be able to bond out.

After Bokenkamp's voir dire testimony, Defendant challenged her for cause and cited her responses to the OWI and murder fact scenarios being contradictory to information counsel had gathered from Bokenkamp's online activity as one of the grounds for the challenge. Defendant stated that he found that Bokenkamp had signed a petition to keep a murder suspect from bonding out which caused him to question her ability to maintain a presumption of innocence. Additionally, Defendant noted that she had signed another petition to revoke the bond of an OWI suspect, to have the State prosecute the suspect to fullest extent of the law, and to fight for the maximum sentence. He stated that he questioned the prospective jurors on identical fact patterns after finding this information and Bokenkamp's responses were contradictory to her internet conduct. The State countered that Defendant failed to question Bokenkamp about how her internet activity contradicted her voir dire testimony. The trial court denied Defendant's motion, stating that the proper procedure was to impeach Bokenkamp regarding her prior statements, by confronting her with the statements which Defendant failed to do.

Now, Defendant highlights that Bokenkamp stated she could convict by clear and convincing evidence, which is a lower standard than beyond a reasonable doubt. Further, Defendant raises in his brief his concern that Bokenkamp stated she wondered how Defendant had gotten into the position he is in. Defendant also argues that her online activity showed that she had signed a petition to deny bond to a defendant arrested for murder, and she requested that others join her in fighting to revoke the bond of a defendant facing DWI charges. Defendant believes this is evidence that she does not believe in the principle of innocent until proven guilty.

The State argues that although Bokenkamp stated that clear and convincing evidence was enough for her to convict, a full reading of the exchange shows that her understanding of what constituted clear and convincing evidence would require that the State provide "overwhelming evidence" that Defendant was guilty and that this is actually in line with the beyond-a-reasonable-doubt standard. Regarding the information found on Bokenkamp's Facebook account, the State argues that Defendant's failure to confront her with what it deems as contradictory to her testimony during voir dire is not evidence of dishonesty on the part of Bokenkamp. Rather, the State suggests that she may have had personal reasons for feeling so strongly about the cases in question or perhaps those statements were attributable to someone she could share an account with, but those are all hypotheticals with no answers because of Defendant's failure to confront her with her past statements.

Defendant's argument about Bokenkamp's lack of understanding about the different burdens of proof, her statement that she could convict if presented with clear and convincing evidence, and his argument that Bokenkamp wondered about how Defendant was in this situation were not raised in the trial court during the discussion of the challenge for cause. According to our supreme court, failure to argue a basis for challenging a prospective juror for cause in the trial court prevents

26

a party from arguing that ground on appeal. *State v. Clark*, 12-508 (La. 12/19/16), 220 So.3d 583, *cert. granted, judgment vacated on other grounds*, ___ U.S. ___, 138 S.Ct. 2671 (2018).

Regarding Defendant's issue with Bokenkamp's internet activity, we find no abuse of discretion in the trial court's ruling, because, as noted by the trial court, Defendant had the opportunity to confront Bokenkamp and impeach her as to her prior statements and failed to do so.

Nevertheless, we have reviewed the whole of Bokenkamp's voir dire testimony and found no indication that the trial court abused its discretion in denying the challenge for cause.

*Fritz Farrar*

Fritz Farrar stated that his wife is the step-sister of the victim's father. Defendant argues that this relationship to the victim and Farrar's relationship with members of the victim's family prevented him from being impartial. Defendant notes that Farrar testified that he knew the victim's father for over thirty years, but his relation to the family would not influence his ability to be impartial. Further, Defendant points out that contrary to Farrar's statements that he did not know the victim's mother, the mother stated that she and Farrar were good friends. Defendant concedes that "[t]he fact that a juror has a relationship with the victim is not itself enough to sustain a challenge for cause." *See State v. Bourque*, 622 So.2d 198 (La.1993), *overruled on other grounds by State v. Comeaux*, 93-2729 (La. 7/1/97), 699 So.2d 16.

The State contends that Farrar's impartiality is not an issue because, as he stated, he did not know the family well, despite the relationship by marriage, was not friends with the victim's father, did not know the victim's mother or even recognize her name, and he had never met the victim.

In *State v. Brown*, 496 So.2d 261, 265 (La.1986), the supreme court found a challenge for cause was improperly denied where a prospective juror whose son had dated the victim in high school, testified that she would have a difficult time facing the victim's parents if she returned a not guilty verdict and also indicated that her son's former relationship with the victim would make it difficult to be impartial. In *State v. Wiley*, 614 So.2d 862 (La.App. 2 Cir. 1993), the second circuit found that the trial court properly granted the State's challenges for cause concerning two jurors who stated that their relationships with the victim and/or the victim's family would influence their decisions. Regarding the issue, the second circuit stated:

> In *State v. Drumgoole*, 517 So.2d 909 (La.App. 3d Cir.1987), a challenge for cause based upon a relationship with the accused's family was found to have been properly granted. Although the potential juror stated that she would vote if she had to, she also stated it would be hard for her to be impartial. Likewise, although the instant potential jurors stated that they would attempt to set aside their bias if forced to, both stated that it would be hard to do so because they felt influenced by their relationship with the defendant. Under these circumstances, the trial court did not err in excusing Henderson and Wimberly for cause.

*Id.* at 866.

The instant case is distinguishable from *Brown*, 496 So.2d 261 and *Wiley*, 614 So.2d 862, because Farrar unequivocally stated that his relationship with the victim's family was not a close one, and he could be impartial. Based on Farrar's testimony during voir dire, we find that the trial court did not abuse its discretion in denying Defendant's challenge for cause as to Farrar. This assignment of error is without merit.

**MOTION IN LIMINE**

In Defendant's third assignment of error, he claims that the trial court erred in denying his Motion in Limine regarding the note found in his vehicle. When Defendant was arrested in Colorado, the arresting officer, Officer Warrick, testified that he was instructed via the warrant attached to Defendant's vehicle to treat the

28

vehicle like a crime scene. He testified that he put items back in the car that had fallen out when Defendant got out of the vehicle. He then removed the keys from the vehicle so he could lock it, closed the doors, and locked the car. He testified that beyond that, nothing was touched or looked through within the vehicle. Officer Warrick then sealed the vehicle with crime scene tape and had the vehicle towed to the police department's garage, where it was held under surveillance camera in a secure lot.

Once the vehicle was impounded, Detective David Wroblewski, with the Glendale Police Department, obtained a search order, and a search of the vehicle produced the note in question. This note was read at trial by Detective Wroblewski. The note, partially quoted above, explained that Defendant acted in the manner he did because he had a rage built up inside of him and felt stress from dealing with a newborn, school, and their relationship.

Defendant argues that the note was not authenticated by the State's own handwriting expert, and the State's failure to authenticate the note makes it inadmissible. Detective St. Cyr testified on cross-examination by Defendant that he subpoenaed the University of Louisiana at Lafayette (ULL) for any handwritten documents by Defendant, who was a student there. Detective St. Cyr testified that because he was not a handwriting analyst, he hired Robert Foley, who was recommended to him by another senior detective. Foley informed Detective St. Cyr that the signature received from ULL would not represent a good enough sample to compare with the note. Detective St. Cyr testified that in order to return to the crime scene and try to obtain a writing sample of Defendant's handwriting, he would have had to apply for another search warrant to enter the home. Detective St. Cyr stated that he did not attempt to obtain another warrant nor did he speak with Defendant's family members or Defendant's potential employers in an attempt to find a suitable

writing sample to compare to the note. Detective St. Cyr testified that the note contained no signature or date and was written on notebook paper. According to Detective St. Cyr, no comparison was ever able to be made.

As noted by the State, La.Code Evid. art. 901 allows for the contents of the writing to be considered with the circumstances to determine the authenticity of a document. Further, La.Code Evid. art. 901(A) also states that a document is admissible if the "evidence [is] sufficient to support a finding that the matter in question is what its proponent claims." The note's author writes about intimate details of his life that affected his emotional state and caused him to commit the act in question. He also speaks from the point of view of the father of the couple's child. This is evidence that the author is Defendant, who was the victim's significant other and father to their newborn son. Additionally, the note was found in Defendant's vehicle when Defendant was arrested. As previously noted, the vehicle was sealed and impounded immediately following the arrest, and the note was found in a subsequent search of the vehicle. The record reflects that no person accessed the vehicle between it being impounded and searched.

Given the evidence, the document was properly authenticated through its contents and the evidence provided, and the trial court did not err in denying Defendant's Motion in Limine to exclude the note from being admitted as evidence. This assignment of error is without merit.

## MOTION TO SUPPRESS

Defendant's fourth assignment of error claims that the trial court erred in denying his Motion to Suppress Gruesome or Otherwise Extremely Prejudicial Photographs and Evidence. In a pretrial writ to this court, Defendant sought to have reversed the trial court's denial of Defendant's motion to exclude over 400 photographs from evidence. This court granted the pretrial writ, stating that the court

30

improperly ruled on the numerous photographs in toto instead of making individualized determinations as to their admissibility. Defendant notes that at trial, the State did not try to admit such a large number of photographs.

Defendant objects to some of the photographs that were admitted, stating that they are highly prejudicial because of their gruesome nature, citing La.Code Evid. art. 403. The first photograph Defendant objects to was S-13 because, as he told the trial court, "it showed a juxtaposition of blood on baby related items such as a pacifier and bottle warmer and was highly prejudicial." During discussion of the photograph with Defendant and the trial court, the State countered that the photograph was relevant to show what steps the State believed Defendant took following the murder, and the trial court allowed it to be admitted into evidence. Defendant's objections to photographs 19, 21-23, 28, 29, 6, and 7, which were also based on the claim that they were highly prejudicial and could be described through witness testimony, were also overruled. In his brief, Defendant states that he objected to photograph 26, 8, and 9; however, the record shows Defendant stated he had no objection to those photographs. Defendant also objects to other photographs which depicted blood on various items around the house such as the light switches and countertops. Defendant objects to photos S-32 and S-33 as well because they showed possible blood stains on children's clothing. The trial court admitted thirty-three other photos of the crime scene that the Defendant objected to because they depicted things like blood on the baby swing power switch and cushion. The actual clothing the child was wearing when found at the crime scene was also admitted over Defendant's objections that they were cumulative and highly prejudicial.

The State presented the following arguments before the trial court as to the photographs that Defendant objected to at trial and now brings on appeal. Photograph 19 was needed to show the victim's body in relation to one of the knives

31

found at the scene and to show what clothes the victim was wearing. According to the prosecution, photograph 21 was needed to show the jury where the blood spatter was located in relation to the victim's body. Photograph 22 was being used to demonstrate, from the blood evidence found next to the victim's body, that a struggle may have occurred. Photograph 23, which showed the victim's head and neck, was needed to show cause of death and intent. Further, the State pointed out that they had narrowed the photos of the victim at the crime scene from 600 to five that would demonstrate their arguments. The State asserted that photograph 28 was needed to show the blood trail leading from the victim's body, and 29 was needed to show the continuation of the blood trail as it led past the bassinet toward the living room. Photographs 6 and 7 were used to show Defendant's movement through the house as demonstrated by the blood droplets on the baby swing.

After a thorough reading of the record, the thirty-three photos Defendant notes in his brief were admitted over his objections, appear to be a group of photos that include photos 19, 26, 21-23, 28, and 29, discussed above. Before testimony began that would include discussion of the crime scene, Defendant suggested that they go through each photograph and deal with any issues of admissibility, rather than continuously interrupting testimony with objections as to the photographs' admissibility. During this discussion, the State noted that it had 33 photographs of the kitchen area, and discussions of admissibility followed as to each photograph, some of which Defendant did not object to. When Detective St. Cyr's testimony about the kitchen portion of the crime scene then began, the State marked the photos as exhibit 4, went over each photo with Detective St. Cyr, then offered them into evidence, which the trial court granted. Defendant then noted that their admission into evidence was over defense's objection; however, as previously noted, when

going through the photographs, there were some that Defendant explicitly stated he was not objecting to.

Our supreme court ruled in *State v. Magee*, 11-574 (La. 9/28/12), 103 So.3d 285, *cert. denied*, 571 U.S. 830, 134 S.Ct. 56 (2013), that the state is entitled to the moral force of its evidence, and the gruesome nature of admitted photographs does not constitute reversible error unless the prejudicial effect of the photos substantially outweighed their probative value.

Here, the State contends that the photographs were admitted to show the wounds suffered by the victim, to show the identity of the victim, to corroborate the statements in the previously-discussed note that Defendant had a rage built up inside of him, and to show specific intent based on the severity of the attack and where the wounds were located. Additionally, the crime scene photographs were introduced to familiarize the jury with the crime scene, to show what the victim was wearing when she died, to show the movement of Defendant through the house, as evidenced by the blood trail, and the fact that the trail of blood was evidence of Defendant injuring himself during the incident in question. The State notes that rather than trying to introduce all of the 600 photographs in its possession, it only attempted to introduce a fraction of that, 88 photos. Further, the State notes that Defendant failed to contemporaneously note the observation that some jurors cried when viewing the photos.

The State's reasons for introducing the photographs were in accordance with the jurisprudence in that they illustrated issues relevant to describe the victim, the location of the crime, and other facts. *Magee*, 103 So.3d 285.

Our supreme court held in *State v. Koon*, 96-1208, p. 34 (La. 5/20/97), 704 So.2d 756, 776, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 570 (1997), that "[p]hotographic evidence will be admitted unless it is so gruesome as to overwhelm

33

the jurors' reason and lead them to convict the defendant without sufficient other evidence. *State v. Perry*, 502 So.2d 543, 558-559 (La.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987) (cites omitted)."

Further, the court in *State v. Broaden*, 99-2124 (La. 2/21/01), 780 So.2d 349, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001), stated that the admissibility of photographic and any other evidence was subject to the same test under La.Code Evid. art. 403, which weighs the probative value of relevant evidence against its prejudicial nature.

Here, as discussed above, there was an abundance of evidence supporting Defendant's guilt such as DNA evidence and the note found in Defendant's vehicle. This assignment of error is without merit.

## EXPERT WITNESSES

Defendant contends in his fifth assignment of error that the trial court erred in allowing Detective St. Cyr to testify as an expert regarding blood splatter and footprints, when he was not qualified as an expert in either area.

When the prosecutor questioned the detective about blood depicted in one of the photographs, the following colloquy occurred:

> A    Kind of the same – I'm sorry.  If you're looking at the – Claire Walley on the ground, to the left of her it's basically showing the floor is what the picture is showing.
>
> Q    These drops right here, are those significant to you?
>
> A    Those would be considered 90 degree drops and –
>
> MR. LUSKIN:  Judge, I'm going to object to the 90 degree drop testimony. If the State wants to introduce testimony about the blood drop evidence that there's experts that can talk about that. It's just that Detective St. Cyr is not qualified.
>
> MS. BILLEAUD:  I think, Your Honor, that he can certainly explain why they were relevant to his investigation.
>
> THE COURT:  Foundation.

34

BY MS. BILLEAUD:

Q     How long have you been a detective?

A     Three years, going on three years.
Q     And you said you've been with the police force for how long?

A     Twelve years.

Q     And have you investigated murders before?

A     This was the first murder at this time I've been – assisted with several other murders.

Q     This is the first you were the lead on?

A     Yes, ma'am.

Q     But you assisted with others?

A     Yes, ma'am.

Q     And have you ever seen blood evidence before?

A     Yes ma'am. I took a class, Blood, Bullets and More, it was a class out of Texas and it went over blood spatter and 90 degree drop and things like that and learned, you know, not as much as the crime scene guys would know, but the basics of how blood works.

Q     And that – knowing that kind of information is important for a detective for what reason?

MR. RUBIN: Judge, I'll object to that question as leading.

MS. BILLEAUD:  Well, I'm asking why it would be important to him.
THE COURT:  It's overruled because she's trying to qualify him as an expert.

THE WITNESS:  It is important because blood tells a story.  And in this situation you can tell if it's a 90 degree blood drop it tells a detective or somebody that – whoever's looking at it can tell that the drops of blood were going straight down.

MS. BILLEAUD:  Your Honor, I'd ask that Detective St. Cyr be allowed to testify in regards to his knowledge of the evidence that he found and why that's relevant to his investigation, and as an expert as far as that's concerned for this investigation.

MR. LUSKIN:  And I'll object, Judge. Acadiana Crime Lab has plenty of people who know this stuff very well. And if the State wanted to

introduce evidence about the blood drops and evidence about its source and the way it may have fallen off, and what it may have fallen off, they could have brought one of those people down; they didn't.

THE COURT:  Overruled.

BY MS. BILLEAUD:

Q       Again, detective we were talking about this photograph. I think you mentioned those droplets?

A       Yes, ma'am. Ninety degree droplets and then the rest of the picture, again, like I was saying, is the left side or the floor on the left side of Claire Walley. And what it shows is, again, kind of what I described in the previous picture on the cabinets with the blood kind of smeared all over. It just leads to us that there was some type of struggle that occurred in this area.

. . . .

Q       Okay. Photograph 24, I'm going to ask you to look at that one.

A       This picture is the – it's her stomach, Claire Walley's stomach. It's kind of her stomach, the floor next to her, and her arm. And what it shows is that on her stomach that's smeared, but then there's blood that appears to be 90 degree drops on her stomach as well which would lead me to believe that –

MR. LUSKIN:  I object, Judge. This is speculation.

THE COURT:  Overruled.

THE WITNESS:  -- which would lead me to believe that there was a tussle here and then after the fact, the blood was dropped on her stomach because it's not smeared.
. . . .

A       Whenever you walk into the living room there's a -- you can see the coffee table and the sofa in the picture. We located blood on the ground between the coffee table and the sofa. Again, those appear to be 90 degree drops, which would lead us to believe that someone was sitting down on the sofa. On the coffee table is a laptop. The power button of the laptop had blood on it, as well as some of the keys.

To the left on the other side of the coffee table is a baby swing. The baby swing had blood on the on/off power switch as well as the cushioning part where you would lay the baby down.

The table to the right --

In *State v. Thibodeaux*, 16-542, pp. 11-12 (La.App. 3 Cir. 3/15/17), 216 So.3d 73, 82-83 (footnote omitted), *writ denied*, 17-642 (La. 12/5/17), 231 So.3d 628, a forensic pathologist was allowed to testify as follows:

> [W]hen Zeb and Charlie returned with the scene photographs, they showed those to me, and I am not a blood splatter expert, but I told Zeb and Charlie—I paint. My wife and I paint the walls in our house, so I'm familiar with what paint does when you flick it off of a paintbrush. If you go straight on at a 90–degree angle, it makes little round circles, and makes those little things kind of shoot outwards, but if you hit a wall at an angle, it gives a tadpole effect, and in the scene photographs that they had shown me, over the headboard were these tadpole-like blood splatter findings, and, to me, that meant that it was at an angle at the time of discharge, or at the time that the pellets hit the body and the blood had expelled from the body, and then, on another wall which was adjacent to that and to the side—alongside of the bed, the blood splatter was straight on, and so I thought there were two different trajectories, one at an angle—
>
> MR. ALEXANDER:
>
> Your Honor, I'm going to object because he's just said he's not a blood splatter expert but he's proceeding to give opinion evidence on blood splatter.
>
> A Well, I'm not finished, sir.
>
> THE COURT:
>
> State?
>
> MR. BRYANT:
>
> He's allowed to testify as to—he's a forensic pathologist who's allowed to testify as to what opinions he came to as to why he continued his investigation into this matter, and he is—he viewed the photographs and why he continued his investigation into this matter, Your Honor. I think he's more than qualified to do this. He's done over five thousand autopsies, he's done gunshot wounds, and I think he's more than qualified to testify in this area.
>
> THE COURT:
>
> Objection's overruled. You may proceed.

This court concluded that Dr. Welke discussed the topic of blood splatter merely to explain the course of action he took in investigating the victim's death

rather than testifying as an expert regarding blood splatter. One distinguishing point in *Thibodeaux* is that this court further stated that if there was an error on the part of the trial court, the error was harmless, as the State presented another witness who qualified as an expert in blood splatter; in the instant case, there was no blood splatter expert presented. In view of *Thibodeaux*, the trial court did not err in allowing Detective St. Cyr to testify regarding blood splatter.

Regarding Detective St. Cyr's testimony about a pair of shoes found at the crime scene matching the bloody footprint found there as well, and that blood appeared to be present on the shoe, Defendant argues that no testing was done to verify that the shoes matched the print.

The following relevant exchanged occurred regarding this issue:

A      This is the same trash can depicted in the picture and it also shows a pair of shoes, moccasin-style shoes, which the sole of the moccasin shoe seem to match one of the footprints.

MR. LUSKIN: Judge, I will object to this     testimony.

THE COURT:  Wait.  I'm sorry.

MR. LUSKIN: I'm going to object to any testimony about the soles of the shoes and what they look and don't look like.  If the State wants to introduce that evidence they should do so through an expert.

THE COURT:  Overruled.

BY MS. BILLEAUD:

Q      You can answer.

A      Okay. I'm sorry. The sole of the shoe, the design of the sole of the shoe appeared to match the same footprint that we located in the kitchen on the ground.

Q      And did it have any other blood on the shoe that you noticed?

A      What we believed to be blood on the shoes, yes, ma'am.

Q      And Number 7?

A     Another picture of the shoes and, again, the blood that – or what we believe to be blood on the shoe.

. . . .

Q     And, again, the shoes are in that picture; is that correct?

A     Yes, ma'am.

Q     Now, just for clarification, Detective, when you say the pattern seemed to match, was that just your visual observation?

A     Yes, ma'am.

Q     Did you do any testing on it or anything like that?

A     No, ma'am.

MR. LUSKING:  Judge, I'm going to object again to this line of testimony. I also object to leading on these questions.

THE COURT:  Overruled.

BY MS. BILLEAUD:

Q     So that was just, as an investigator, something you noticed?

A     Yes, ma'am.  It appeared that they were the same pattern.

Q     You didn't conduct any tests on them?

A     No, ma'am.

The trial court noted that a layperson could match the tread of the shoe to the footprint, and expert testimony was not required.  Defendant then noted that La.Code Evid. art. 701 limits the testimony of lay witnesses to opinions that are based on the witness's own perception and which will assist in providing clarity to his testimony or to a determination of a fact that is at issue.

The State argues in its brief that any layperson could make a visual determination as to whether they think a shoe matches a footprint.  Further, it argues that Detective St. Cyr's testimony about the shoe was another instance of him

explaining why he viewed some evidence at the scene to be of significant value to the investigation.

In *State v. Smith*, 10-830 (La.App. 3 Cir. 2/9/11), 58 So.3d 964, *writ denied*, 11-503 (La. 9/30/11), 71 So.3d 279, this court, relying on *State v. McGuire,* 560 So.2d 545 (La.App. 1 Cir.), *writ denied*, 565 So.2d 941 (La.1990), found a detective need not be qualified as an expert to give testimony comparing the shoe print found in one of the victim's vehicles to the defendant's shoes.

Thus, the trial court was correct in its determination that Detective St. Cyr could testify whether the imprint from the shoe and the sole of the shoe appeared to be the same.

Defendant also urges that the State attempted to cure this defect in Detective St. Cyr's testimony by calling Mark Kurowski, a forensic chemist with the Acadiana Criminalistics Laboratory, and that this attempt only served to confuse the jury because his tests to determine if the moccasins found at the crime scene matched the bloody shoe prints were inconclusive.[3] Further, at trial, Defendant objected to Mr. Kurowski's testimony on the grounds that he was not provided notice of his expert testimony or a curriculum vitae, as required under La.Code Crim.P. art. 719. Defendant argued that this lack of notice prejudiced Defendant because he was unable to call his own expert witness to counter any evidence presented by Mr. Kurowski. According to Defendant, despite filing a "Motion for Criminal Discovery and for Production of Exculpatory Evidence" on April 11, 2016, the State did not notify Defendant of their intent to call Mr. Kurowski as an expert witness in shoe print analysis, nor was the defense provided with a report so that they could retain an expert.

---

[3]In his brief, Defendant states that Mark Kurowski was a forensic chemist with the Louisiana Crime Lab; however, his testimony reveals that he was a forensic chemist with the Acadiana Criminalistics Laboratory.

The State argues that Mr. Kurowski was called as an expert witness only after Defendant made an issue of the shoe prints in voir dire. According to the State, it had obtained a forensic examination report only a week or two before trial and immediately disclosed the results to Defendant. At that time, the State informed Defendant that it did not intend to call an expert on the matter if the parties agreed not to discuss the shoe prints at trial. Once Defendant brought up the issue of shoe prints in voir dire, the State asserts that it informed the defense that if they presented arguments or evidence that the State had not conducted testing or other investigatory steps in regard to the shoe prints then the State would have to call their expert to refute such claims despite the results coming back as inconclusive. If the expert was called, the State also offered to stipulate that he would testify to the fact that he conducted testing on the shoe prints which came back as inconclusive. Defendant refused to agree to the stipulation, so the State immediately produced a copy of the expert report for the defense.

When the State and Defendant discussed this with the trial court upon Defendant's motion to exclude Mr. Kurowski from testifying, Defendant argued that had they agreed to the stipulation, they would have had to agree to it being expert analysis, which they would not do because, at that point, they had not received any of the required documentation under La.Code Crim.P. art. 719. The trial court denied Defendant's motion to exclude Mr. Kurowski's expert testimony.

In its brief, the State argues that it complied with La.Code Crim.P. art. 719 by notifying Defendant of Mr. Kurowski's testimony and producing a copy of his report as soon as Defendant brought the topic of shoe prints up in voir dire.

Louisiana Code of Criminal Procedure Article 719 states:

A. Upon written motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or

41

copies thereof, of a physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. If the witness preparing the report will be called as an expert, the report shall contain the witness's area of expertise, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor. If the expert witness has not reduced his results to writing, or if the expert witness's written report does not contain the information required of an expert as provided in this Article, the state must produce for the defendant a written summary containing any information required to be produced pursuant to this Article but absent from a written report, if any, including the name of the expert witness, his qualifications, a list of materials upon which his conclusion is based, and his opinion and the reason therefor.

To support his argument, Defendant cites *State v. Burgess*, 482 So.2d 651, (La.App. Cir. 1985), where the fourth circuit held that expert examinations and test results made by an expert witness were subject to discovery under La.Code Crim.P. art. 719.

Although we were unable to find any jurisprudence analogous to the case at hand, *Burgess* is distinguishable from the instant case because in *Burgess*, the State produced the final reports of the experts but tried to prevent discovery of the experts' test results by marking them as not intended for use at trial and by claiming they were work product and thus immune from discovery. In the case at hand, the record does not reflect that the State tried to prevent discovery of any of the testing or the report done by Mr. Kurowski. Rather, the State informed Defendant of Mr. Kurowski's results and told them that they did not intend to call him at trial unless Defendant intended to bring up the shoe prints. The record does not indicate that Defendant ever subpoenaed the report or information from the experiments performed by Mr. Kurowski when they were informed of them by the State.

With regard to the expert testimony of Mr. Kurowski, Defendant knew of Mr. Kurowski's experiment and the results from that experiment as well as the State's intention not to call Mr. Kurowski as an expert witness unless Defendant made the

shoe prints at the crime scene an issue at trial. When Defendant decided he would address the shoe prints at trial, he could have made a discovery request under La.Code Crim.P. art. 719 to obtain the documents and information he complains of not receiving timely or at all.

For those reasons, the trial court did not err in allowing either Detective St. Cyr to testify as to the blood spatter and shoe prints or Mr. Kurowski as an expert in regard to the shoe prints. Accordingly, these assignments of error are without merit.

## EXPERT TESTIMONY

In Defendant's last assignment of error, he argues that the trial court erred by allowing Dr. Christopher Tape to testify to information that was not contained in his autopsy report. Defendant contends that his Motion in Limine to exclude the testimony of Dr. Tape regarding his opinion that the wounds the victim suffered to her neck seemed to be consistent with an attack from behind and the attacker cutting her neck with his right hand because this information was not contained in Dr. Tape's autopsy report. Further, Defendant argues that Dr. Tape was also allowed to testify to information not included in his report when he testified that it was very likely that the victim did not sustain her injuries all at one time. Based on this testimony, Defendant moved for a mistrial pursuant to La.Code Crim.P. art. 775, on the grounds that the testimony violated La.Code Crim.P. art. 719 and was highly prejudicial.

The State argues that the fact that the cuts to the victim's neck were deeper on the left than on the right was included in Dr. Tape's written report, and the State merely asked follow up questions to expound on this observation as to why this might be the case. The State further contends that it was not required to produce answers to these follow-up questions before trial because the information was not exculpatory evidence. The State notes that it provided Defendant with a copy of Dr. Tape's report months prior to the commencement of the trial, and the defense had

43

ample opportunity to hire an expert to refute or provide its own theories regarding the findings in the report.

We find that because the observations that form the basis for Dr. Tape's opinions about the attack are found within the report, the trial court did not err in allowing Dr. Tape's testimony to be admitted. This assignment of error is without merit.

## DECREE

Defendant's conviction and sentence for the second-degree murder of Claire Walley are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**